MICHAEL STEINER ET AL. v. BRAN PARK ASSOCIATES
ET AL.
(14056)

PETERS, C. J., SHEA, CALLAHAN, GLASS and COVELLO, Js.

Argued September 25—decision released November 13, 1990

*F. Herbert Gruendel,* with whom were *Jonathan Katz* and *Steven D. Ecker,* for the appellants (plaintiffs).

*William F. Gallagher,* with whom, on the brief, were *Mark S. Shipman* and *Gwen B. Weltman,* for the appellees (defendants).

SHEA, J. The plaintiffs brought an action on a real estate contract for the purchase of a parcel of land owned by the defendants. The plaintiffs sought specific performance of the contract, damages, and restitution of sums paid in advance that allegedly were to have been credited toward the purchase price. The trial court bifurcated the claim for specific performance and the claims for monetary relief[1] and, after a trial to the court on the issue of specific performance, denied the plaintiffs' claim for specific performance. The principal basis for the denial was the trial court's finding that the plaintiffs had failed to sustain their burden of proving that they were ready, willing and able to purchase the property within a reasonable time after the date specified in the contract. From this judgment the plaintiffs appealed. We affirm the judgment of the trial court.

On appeal, the principal issue is whether the evidence supports the trial court's finding that the plaintiffs were unable to perform within a reasonable time after the performance date.

---

[1] The defendants initially requested an expedited trial hoping to remove a lis pendens placed on the property so that they could then prepare to lease or sell the building, which was becoming vacant. The judge who heard the request, *Celotto, J.,* bifurcated the equitable and legal issues and ordered the court trial on the issue of specific performance to be expedited, leaving a jury trial on the legal issues for a later date. Subsequently, the plaintiffs, without objection, waived a jury trial and requested that the entire case be tried to the court. Because little time remained in the court calendar, the trial court, *Dunnell, J.,* decided not to revise Judge Celotto's order and limited the trial before her to the issue of specific performance. During the proceedings, the defendants withdrew their countersuit against the plaintiffs, a quiet title action that had been consolidated with the present action, so that the only issue tried was the issue of specific performance.

## I

The trial court found the following facts, which are not challenged on appeal. In February, 1984, the plaintiff Michael Steiner[2] and the defendants executed a sales agreement for a parcel of property in Branford. The agreement provided that the closing would take place on August 14, 1986, but that Steiner's failure to make certain payments required prior to that date would terminate the agreement. The advance payments would be credited toward the purchase price.

The parties amended the agreement in February, 1986. The amendment increased the purchase price, required additional advance payments, which would not be credited toward the purchase price, and set the closing date for "no later than August 27, 1986."

Steiner initially planned to obtain financing by forming an association with Carl Marks Realty Services, Inc. (Carl Marks), a New York development corporation. The defendants were aware of this plan and consented to Steiner's assignment of the sales contract to Carl Marks as collateral for loans used for the advance payments. In July, 1986, Steiner's negotiations with Carl Marks broke down when Carl Marks expressed concern that Steiner could not or would not answer calls for capital needed to develop the property. Steiner then proposed to add Harry Skydell and Allen Kaplan, two successful developers, as joint venturers. Carl Marks was satisfied with this plan, and the proposed investors began negotiations on a formal joint venture agreement.[3]

---

[2] The other plaintiff in this case, MIF Associates Limited Partnership, is the successor in interest to the plaintiff Steiner's rights in the contract at issue. Steiner is the sole shareholder and president of MIF Enterprises, Inc., the general partner of MIF Associates Limited Partnership.

[3] The proposed joint venture agreement would have involved 50 percent ownership by Carl Marks, the other 50 percent to be owned by a group

Starting with a letter to Carl Marks on August 13, 1986, the defendants began to insist that the closing take place as scheduled on August 27, 1986. When the plaintiffs asked for more time, the defendants demanded additional payments to extend the closing date, and when that demand was ignored, insisted that if a closing did not take place on August 27, the plaintiffs' "option" would expire. No closing took place. After August 27, there was at least one meeting between the defendants' and the plaintiffs' counsel to attempt to renegotiate the contract, but no agreement was reached.

From August, 1986, through October 15, 1986, Steiner and his associates endeavored to complete the planned joint venture agreement. On September 4, Steiner obtained a letter of intent from Skydell, Kaplan, and his own partners, but that letter contained a termination clause of September 11 if no closing was held by that date. On September 19, Steiner, Skydell and Kaplan signed a letter of agreement with Carl Marks, contingent upon execution and delivery of a formal joint venture agreement. A draft of the joint venture agreement was still being worked on as late as October 15.

The trial court concluded, first, that time was not of the essence of the sales contract. It held, therefore, that

consisting of Skydell, Kaplan, Steiner and his partnership, MIF Associates Limited Partnership. Under one version, 50 percent would have been owned by Carl Marks and 50 percent by MIF Associates. MIF Associates would have previously admitted Kaplan as a limited partner and Steiner would have made Skydell a shareholder in MIF Enterprises, Inc., the general partner of MIF Associates Limited Partnership. The project was expected to cost roughly eight million dollars: four million dollars in purchase price and four million dollars in development. This figure was expected to include four million dollars in cash and four million dollars in seller financing secured by Carl Marks' letters of credit. Each 50 percent owner would have contributed 50 percent of the cash and been responsible for 50 percent of the financing. Thus, all of the participants in the purchase were to be equity investors, not mortgage lenders.

the contract required performance within a "reasonable time" after the August 27, 1986 closing date. After considering the parties' prior conduct, the trial court next concluded that the contract would permit only a "short delay" in the transaction without additional premium payments.[4] Second, the trial court held that the plaintiffs' inability to reach a final accord on a formal joint venture agreement meant that they were "unable" to close within the time a "short delay" would afford and hence were not entitled to the equitable remedy of specific performance. The court held that while the defendants' repudiation of the contract did, as a matter of law, excuse the plaintiffs from demonstrating their "readiness" to close, it did not, as a matter of fact, interfere with their ability to close, so that the defendants' conduct did not excuse the plaintiffs from demonstrating their "ability" to close. The court did not reach the issue of the plaintiffs' "willingness" to close.

## II

A buyer seeking specific performance must prove that he was "ready, willing and able" to purchase the property. *DiBella* v. *Widlitz,* 207 Conn. 194, 200, 541 A.2d 91 (1988); *Allen* v. *Nissley,* 184 Conn. 539, 542, 440 A.2d 231 (1981). "A buyer must prove his financial ability to go forward even when a seller entirely refuses to participate in a closing." *DiBella* v. *Widlitz,* supra; *Frumento* v. *Mezzanotte,* 192 Conn. 606, 616, 473 A.2d 1193 (1984). Whether a buyer has the requi-

---

[4] Because the trial court found the plaintiffs were not "able" to close within "a reasonable time" after August 27, 1986, the court did not explicitly decide whether the defendants had breached the contract at any time and in particular whether the defendants had repudiated the contract. At trial, counsel stipulated that after August 27, the defendants would not close on the same terms and conditions as specified in the contract. In view of the trial court's ruling that time was not of the essence of the contract, the defendants' action would constitute a breach absent some legal excuse.

site financial ability is a question of fact. *Parkway Trailer Sales, Inc.* v. *Wooldridge Bros., Inc.,* 148 Conn. 21, 26, 166 A.2d 710 (1960); *Romaniello* v. *Pensiero,* 21 Conn. App. 57, 60, 571 A.2d 145 (1990).

In *Frumento,* supra, this court approved the principle that "when a purchaser of land is left to depend upon a purchase price loan from a third party who is *in no way bound* to furnish such funds, the purchaser cannot be considered to be able to perform so as to be entitled to specific performance"; (emphasis added) *Frumento* v. *Mezzanotte,* supra, 617; but made clear that the determination of what constitutes "ability" is a question of fact to be determined in light of the circumstances of the particular case. *DiBella* v. *Widlitz,* supra, 200; *Frumento* v. *Mezzanotte,* supra. A trial court's finding of "inability," which involves a factual issue, will not be reversed unless it is clearly erroneous. See Practice Book § 4061.

## A

The plaintiffs contend that the trial court applied the wrong standard of "ability" when making its factual finding. The plaintiffs read the trial court's decision to say that as a matter of law, a buyer seeking specific performance must prove his backer was contractually bound to provide the funds. The plaintiffs point to language in the decision reciting that "the buyers herein never obtained signed agreements" and "a plaintiff must demonstrate that this source [of funds] was unequivocally committed to furnish these sums at closing."

We disagree with the plaintiffs' reading of the decision. First, while the trial court did use the language quoted, it also specifically stated: "It does not appear to this court that *Frumento* requires an express written commitment." Second, the sentence in the trial court's decision using the words "unequivocally com-

mitted" is immediately followed by this sentence: "In terms *specific to the present factual situation,* plaintiffs must prove that their financial backers were *bound in some way* to provide the necessary funds within a reasonable time after August 27, 1986." (Emphasis added.) Thus, the trial court construed *Frumento* correctly, and simply made a factual finding different from the one the plaintiffs proffered. The trial court did not hold that in *every* case a buyer must have a written commitment from a financial backer. What it did find was that in *this* case, in the absence of an executed joint venture agreement, the equity investors were not "bound in some way" to provide the funds. An executed joint venture agreement was a condition precedent, not only to the backers' actual advancement of the funds at the closing (the buyer's "readiness"), but also to the backers' commitment to produce those funds (the buyer's "ability" to pay).

## B

We agree with the trial court that in this case, a final joint venture agreement was essential. We do not hold that, as a matter of law, a buyer who plans to finance his purchase by enlisting coinvestors who will participate as joint venturers must always have an executed joint venture agreement to demonstrate his ability to pay. Rather, it was the expressed intent of these particular investors that the executed joint venture agreement be a condition precedent to their association and thus to their commitment to provide the needed funds.

The evidence supports the trial court's finding. First, there was evidence that the principals intended that execution of the agreement would take place before the closing, not simultaneously with the closing. Martin Schiffman, the president of Carl Marks, testified that in order to obtain the letters of credit needed to obtain

some of the financing for the project, the *joint venture* would have had to incur fees of $30,000 to $60,000 prior to the closing.

Second, because Carl Marks would not participate without the other investors' participation, nailing down the terms of the parties' relationship was essential before Carl Marks would commit to provide funds. Schiffman testified that Carl Marks' relationship with Steiner was revived only when Steiner brought in Kaplan and Skydell, and that, had they left the deal, Carl Marks would have abandoned it also. The letter of agreement signed by Steiner, Skydell, Kaplan and Carl Marks on September 19, 1986, specifically provided that Carl Marks would not be obligated until "a formal joint venture agreement acceptable to our respective counsel has been executed and delivered by all parties." Skydell testified that Carl Marks consistently had told him that "anything could happen," and that they would not be committed "until the final documents [were] executed on a satisfactory basis to their attorney and to them."

The same condition precedent applied to Skydell. The letter of intent signed by Skydell, Kaplan, Steiner and his partners on September 4, 1986, expressly stated that Skydell's obligation would not arise until a formal agreement between those investors was executed; it was not. Skydell signed the letter of agreement dated September 19, 1986, stating that no obligation would arise until the joint venture agreement was executed and delivered. Skydell testified that he preferred to be the "silent partner" with Carl Marks holding a 50 percent interest because he did not want to commit the time to "the headaches" of developing the property. He had had prior dealings with Carl Marks and considered it "providential" that they were in on the deal. Although Skydell testified that he would have been

ready to pay for the entire project himself, he also testified that he had never discussed release of Carl Marks' collateral assignment of the contract, which would have been required for him to proceed without Carl Marks, and had taken no direct action despite the fact that he knew things were moving much too slowly for the multimillion dollar transaction involved. The defendants demonstrated numerous inconsistencies between Skydell's testimony at his deposition and his testimony at the trial. The trial court was entitled to evaluate the conflicting testimony and to conclude that Skydell's protestations of willingness to finance the purchase did not accurately reflect the degree of his commitment within a "short time" after August 27, 1986. *Gaynor-Stafford Industries, Inc.* v. *Water Pollution Control Authority,* 192 Conn. 638, 647, 474 A.2d 752, cert. denied, 469 U.S. 932, 105 S. Ct. 328, 83 L. Ed. 2d 265 (1984) ("[t]he resolution of conflicting testimony is within the exclusive province of the trial court").

## C

The plaintiffs contend that the trial court's finding of inability was incorrect because the joint venture agreement could not have been completed once the defendants had repudiated the sales agreement. The plaintiffs assert that the court's reasoning places buyers whose sellers have repudiated in a "Catch-22" situation. In this case, the plaintiffs could not sign the agreement after the defendants had repudiated the contract of sale, because the joint venture agreement required a statement from Steiner warranting that the subject property was still available for purchase. Similarly, they argue, a buyer who cannot obtain financing without providing his bank with a mortgage deed warranting title to the property would be foreclosed from obtaining specific performance if the seller repudiated before the closing. They contend further that this judgment

requires a buyer whose seller has repudiated a contract to engage in an exercise in futility by completing financing preparations when there is no prospect of purchase. In essence, the plaintiffs' claim is that the defendants' repudiation of the agreement should excuse them from having to prove their ability to perform.

The trial court correctly ruled that while a seller's repudiation excuses a buyer seeking specific performance from demonstrating readiness, it does not excuse a buyer from demonstrating ability.[5] *DiBella* v. *Widlitz,* supra, 200; *Romaniello* v. *Pensiero,* supra, 60. The court did not, however, ignore the plaintiffs' claimed dilemma. Because "[i]t is axiomatic that the delay of one party may be excused where it is caused, at least in part, by the acts of the other party"; *Bertozzi* v. *McCarthy,* 164 Conn. 463, 470, 323 A.2d 553 (1973); the trial court did consider the plaintiffs' claim that the defendants' repudiation of the contract prevented them from becoming "able" to perform. It rejected that claim, stating: "[T]he court finds no evidence that [the plaintiffs] were hindered by the sellers' conduct from executing their own joint venture agreement within a reasonable time." As a finding of fact, the court's rejection of the claim will not be disturbed unless it is clearly erroneous. *DiBella* v. *Widlitz,* supra, 198.

---

[5] At oral argument, the plaintiffs emphasized the futility of completing preparations for financing when the sellers had already refused to convey. If the plaintiffs had sought only damages, there might have been merit to the argument. Where the remedy sought is specific performance, however, the financing preparations are not futile, because they will, if the plaintiff prevails, produce the desired result: conveyance of the property to the plaintiffs. There is always a risk that efforts to obtain financing for a purchase may prove fruitless. The seller may breach; the property may be destroyed; at the eleventh hour, there may be a defect in title. Despite these risks, buyers must make the necessary financial arrangements. Similarly, the ready, willing and able buyer who sues for specific performance takes the risk that the court in its equitable discretion will refuse the order. Such uncertainty does not render financing preparations futile.

There was conflicting evidence concerning whether the defendants' repudiation of the contract actually stood in the way of formation of the joint venture agreement. The plaintiffs made much of a clause in the draft agreement requiring them to assert that the property was still "available," a clause they could no longer truthfully sign. The court could have found that inserting a contingency clause in the agreement would have eliminated this problem. The court accepted the testimony of Martin Schiffman, the president of Carl Marks, that nothing the sellers had done prior to the September 19 letter of intent prevented them from reaching agreement with Steiner. Skydell himself testified that, in his view, Carl Marks was being very "picayune" and "bureaucratic" in preparing the joint venture agreement and that this was the reason the joint venture agreement was not completed. There was ample testimony that as late as September 23, the defendants spoke with the plaintiffs' attorney in an attempt to resuscitate the sale and were informed that it would take thirty to sixty days longer for the plaintiffs to be ready to close. The plaintiffs never called that attorney as a witness, suggesting that his testimony on this point might have been unfavorable to them. Finally, the court viewed the circulation of draft joint venture agreements through October as negating any inference that the defendants' repudiation in August blocked the completion of the joint venture agreement. The court's analysis is plausible, logical, and supported by the evidence.

D

The plaintiffs' second claim is that the trial court improperly excluded evidence concerning the defendants' alleged breaches of the sales agreement except when relevant to the issue of what would constitute a "reasonable time" for the closing. A party challeng-

ing a trial court's exclusion of evidence has the burden of showing that the ruling was probably harmful. *Shelnitz* v. *Greenberg,* 200 Conn. 58, 79, 509 A.2d 1023 (1986). We conclude that any error in excluding the evidence was harmless, because the trial court was correct in holding that the plaintiffs (1) did not meet their burden of proving their *ability* to close within a reasonable time, and (2) were therefore not entitled to the remedy of specific performance.

Our decision in *DiBella* v. *Widlitz,* supra, places the initial burden in an action for specific performance on the plaintiff buyer to demonstrate that he was ready, willing and able to perform. If the buyer cannot prove these conditions precedent to the seller's obligation, the subject of specific performance is closed. Only when the buyer shows that he was ready, willing and able does the seller's breach become relevant. In order to obtain specific performance, it goes without saying that the plaintiff buyer must also prove that the defendant seller did not himself perform. Whether the issue of the defendants' alleged nonperformance, or the issue of the plaintiffs' alleged readiness, willingness and ability, is considered first, is up to the trial court. The order in which evidence is received is within the discretion of the trial court. *State* v. *Gaston,* 198 Conn. 490, 495 n.2, 503 A.2d 1157 (1986); *Shulman* v. *Shulman,* 150 Conn. 651, 659, 193 A.2d 525 (1963); see Practice Book § 283.

The plaintiffs also claim that evidence concerning the defendants' supposed bad faith in failing to live up to other terms of the contract was relevant to the trial court's consideration of the equities involved. Once the trial court had found that the plaintiffs were not *able* to perform the contract and had also ruled that the defendants' conduct had not itself *caused* that inabil-

ity,[6] however, any additional equitable considerations would have made no difference.

The judgment is affirmed and the case is remanded for further proceedings on the remaining issues.

In this opinion the other justices concurred.

---

[6] There is no reasonable basis for the plaintiffs' contention that the excluded evidence of the defendants' wrongful conduct would have shown that the defendants actually hindered the plaintiffs from becoming "ready, willing and able" to perform within a reasonable time after August 27, 1986. The court *did* admit evidence concerning whether the defendants possessed marketable title as of August 27, 1986, because under one construction of Paragraph 9 of the sales contract, the defendants' lack of marketable title would have extended the closing date thirty days. The admitted evidence included testimony concerning potential hazardous waste contamination of the property that might have subjected it to a "superlien" under General Statutes § 22a-452a and thus might have rendered it unmarketable.