## LANDMARK INVESTMENT GROUP, LLC *v.* CHUNG FAMILY REALTY PARTNERSHIP, LLC
### (AC 31449)

Bishop, Harper and West, Js.

Argued September 22—officially released December 28, 2010

*Walter A. Twachtman, Jr.,* with whom, on the brief, was *John H. Grasso,* for the appellant (defendant).

*Christopher Rooney,* with whom, on the brief, were *Anne D. Peterson* and *Kurtis Z. Piantek,* for the appellee (plaintiff).

*Opinion*

BISHOP, J. The defendant, Chung Family Realty Partnership, LLC, appeals from the judgment of the trial court in favor of the plaintiff, Landmark Investment Group, LLC (Landmark), on its complaint alleging breach of contract, breach of the implied covenant of good faith and fair dealing, and violation of the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq.[1] On appeal, the defendant claims that the court incorrectly (1) found that there was no mutual mistake of fact rendering the parties' contract voidable; (2) found that the defendant breached the contract by terminating the agreement (a) without giving Landmark thirty days notice, and (b) for the purpose of taking advantage of an offer by a third party; (3) awarded specific performance of the agreement to

---

[1] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

Landmark; and (4) found that the defendant's actions violated CUTPA. We affirm the judgment of the trial court.

The following facts and procedural history set the context for our discussion of the issues on appeal. On June 28, 1999, the defendant purchased a small strip mall/semi-industrial parcel of property (property) at 311-349 New Britain Avenue in Plainville, executing purchase money mortgages of $229,048 and $325,952. The defendant's owner, Henry Chung, who operated a restaurant on the property, had formed Chung Family Realty Partnership, LLC, in December, 1998, with the intention of developing the property. He was aware at the time of purchase that it required environmental cleanup and remediation. Being unfamiliar with the complexity and expense of such a venture, however, the defendant's attempts to develop the property, which was its sole asset, were unsuccessful. The cost of environmental remediation alone was estimated in February, 2004, to be $1,004,000, and the defendant also owed attorney's fees of over $100,000 incurred in the purchase and development of the property. Consequently, the defendant put the property on the market.

Through its real estate agent, Ralph Calabrese, the defendant negotiated a purchase and sale agreement (first contract) for the property with Landmark, which was executed on January 4, 2005, and included provisions to deal with the cost of environmental remediation. Attorney Peter Barry began to represent the defendant in this transaction in May, 2005. In June, 2005, the estimated cost of remediation was revised to $1,314,006.82.

Given the uncertainties surrounding the prospective cost of remediation, a second agreement (agreement) was executed on June 30, 2005, superseding the first

contract. As increased protection for the buyer, it provided for the entire net proceeds of the purchase price to be placed in escrow until the remediation was completed. Additionally, Landmark retained the unilateral right to withhold performance if it determined, in its sole discretion, that the full cost of remediation would not be covered.[2] To aid in covering the cost, the agreement provided that the parties would apply to the Connecticut brownfields[3] redevelopment authority (redevelopment authority) for environmental cleanup funding (brownfields funding) pursuant to General Statutes § 32-9kk.[4]

To start the brownfields application process, the defendant was obligated to produce a remediation action plan (action plan) to be provided to Landmark within twenty days of the execution of the contract. Upon receipt of an approved action plan, Landmark was

[2] In its memorandum of decision, the court mistakenly substituted "seller" for "buyer" when describing this provision.

[3] General Statutes § 32-9kk (1) defines brownfield as "any abandoned or underutilized site where redevelopment and reuse has not occurred due to the presence or potential presence of pollution in the buildings, soil or groundwater that requires remediation before or in conjunction with the restoration, redevelopment and reuse of the property."

[4] An application for brownfields funding usually proceeds with the participation of the municipality in which the property is located. The landowner retains an expert to complete a remediation action plan that must then be approved by the department of environmental protection. The municipality includes the approved action plan in a loan application to the redevelopment authority. If the loan is approved by the redevelopment authority, it is repaid by the city, with the result that, from the landowner's perspective, it has the same effect as a grant.

The memorandum of decision described the rationale as follows: "In simple terms, a municipality borrows funds from [the redevelopment authority] and advances said funds to the landowner for any work necessary to remediate the property from environmental contamination. The municipality participates in anticipation of recovering its costs through tax incremental financing . . . or the taxes that would be generated through the ultimate development of the property. Before agreeing to participate, the municipality will estimate revenue from the site in order to assess its ability to repay the loan."

obligated to submit the loan application. The defendant, however, failed to produce a timely action plan because it could not afford to pay an environmental engineering firm to assess the site. After a long delay, the town of Plainville (town) intervened to secure funding for the assessment. During the assessment process, the environmental engineers were able to examine areas that previously had been inaccessible, and, as a result, they found that the required remediation and attendant costs had been drastically overestimated. Their report of July 12, 2006, gave a new remediation estimate of $265,000, over $1 million less than the prior estimate. Because of this substantial reduction, the town concluded that its participation in the brownfields application was not necessary.

Upon learning of the town's revised position, Barry wrote to Landmark on July 25, 2006, asserting that certain elements of the agreement were contingent upon the approval of brownfields funding and that, without the funding, it would have to be renegotiated. This was not the defendant's first effort to avoid the agreement. Previously, on August 31, 2005, eight weeks after the agreement was executed, Calabrese had instructed Barry to "[r]eview the contract to determine if [Chung] has any way out of it if he so chooses." Also, on March 21, 2006, the defendant had written to Landmark's attorney to request a meeting, citing concerns that Landmark would not be able to procure the mortgage on which the agreement was contingent and that Landmark had not completed a site plan of development to file with the brownfields application.[5]

Upon receipt of Barry's letter of July 25, 2006, Landmark replied on August 3, 2006, that the agreement could still be performed. Nevertheless, in a letter on

---

[5] Notably, the brownfields application could not be completed without the action plan, which was the defendant's obligation and was long overdue.

August 23, 2006, Barry maintained that the agreement was impossible to perform and that a new agreement was needed. The parties held a meeting on September 7, 2006, which was short and contentious, at which Barry and Calabrese insisted that the agreement was "null and void" and "over," while Landmark's representatives insisted that it remained in force.[6] In a subsequent letter on September 12, 2006, Barry asserted again that the defendant would honor the agreement only if brownfields funding was approved. He also alleged that Landmark had failed to deposit $100,000 as required at the execution of the agreement and had not retained the environmental consultant listed in the agreement. Landmark replied on September 25, 2006, denying the allegations and requesting a final version of the action plan.[7] On September 28, 2006, Landmark wrote to the redevelopment authority, indicating that it was sending the final application materials, including the action plan and its own site plan.

While this relationship was unraveling, the defendant was in conversation with a third party, Calco Construc-

[6] The court found Landmark's minutes of the meeting to be factually correct: "[R]epresentatives of Landmark met with the Chung Family [Realty Partnership], LLC, representatives at . . . Barry's office on September 7, 2006, for a meeting which turned out to be short and contentious. . . . At the September 7 meeting . . . Barry stated that the 'money for a remediation is lower than expected and the town of Plainville is not willing to participate in brownfields and that the contract is null and void and can't be performed.' . . . He was of the view that they needed a new contract to continue. [Landmark's counsel] replied that the contract was still in force and could be performed. [Landmark's counsel] expressed the view that . . . Chung now had to pay for the remediation in the absence of the [redevelopment authority] obtaining funding. At that time . . . Calabrese became angry and said, 'No way the contract is over! Landmark has to pay.' [Landmark's manager] stated that the money to remediate was less than expected, which means that . . . Chung gets more money and he can't say now that he is getting more money that he thought the contract was over. A general disagreement followed, and the meeting ended after Landmark departed. . . . By all accounts, the meeting was short, [ten to fifteen] minutes." (Citations omitted.)

[7] The court found that Landmark received the action plan in final form in September, 2006, more than one year after the agreement had been executed.

tion & Development Company (Calco), which submitted a purchase offer for the property on January 25, 2006. Although the defendant did not act on that offer, Calco's interest was ongoing. Late in the summer of 2006, Calco and Calabrese discussed the elements necessary to an offer that would be attractive to the defendant. Shortly thereafter, on September 7, 2006, Calabrese and Barry declared at the meeting with Landmark that their agreement was "over." Then on September 21, 2006, Calco submitted a purchase offer containing the new terms suggested by Calabrese and a check for $250,000 to be escrowed until a final agreement was reached.[8]

On October 27, 2006, Barry sent a letter to notify Landmark that the defendant was terminating the agreement.[9] The defendant subsequently executed a contract to sell the property to Calco on March 6, 2007, and assigned the original mortgages, which were obligations of Chung, to Calco under that contract.

On December 13, 2006, Landmark filed a complaint in six counts, alleging breach of contract, breach of the implied covenant of good faith and fair dealing, a violation of CUTPA and interference with contractual relations. It sought either specific performance or a

---

[8] The September 21, 2006 offer stated in relevant part: "One million eight hundred thousand ($1,800,000) dollars—The Purchase Price shall be paid to Seller at Closing. Closing to occur within thirty (30) days following an executed Purchase and Sale Agreement. Property is being sold 'As Is,' with no contingencies or conditions. Buyer understands and accepts the environmental conditions of the Property." Commission on the sale would be paid to the R. Calabrese Agency, LLC. The offer was signed by Calabrese, followed by the signature of Calco's president.

[9] The letter listed the following allegations in support of termination: failure of Landmark to file an application for brownfields funding within the designated time; failure of the town to join in the application; failure of Landmark to deposit money in escrow properly; failure of Landmark to retain the services of the environmental consultant named in the contract; and refusal by Landmark to renegotiate the contract. The defendant also asserted that it was entitled to the earnest money damages as a result.

return of deposit, money damages, punitive damages and attorney's fees pursuant to CUTPA, and interest and costs. The defendant answered on September 13, 2007, and filed special defenses averring that Landmark was limited to remedies set forth in the agreement, that all other relief sought was barred by the economic loss doctrine and that the agreement was voidable due to mutual mistake. The defendant also counterclaimed in four counts, alleging slander of title, breach of contract, violation of the covenant of good faith and fair dealing, and violation of CUTPA. At trial, Calco provided the defendant with an attorney and funded the trial costs.

On August 19, 2009, the court rendered judgment in favor of Landmark, rejecting the defendant's special defense of mutual mistake and finding breach of contract and violation of CUTPA. The court awarded Landmark specific performance on the contract claim, including a return of its deposit should it elect under the contract to terminate its obligations, and attorney's fees on the CUTPA claim.[10] On December 21, 2009, the court rendered judgment in favor of Landmark for attorney's fees and costs of $171,813.54. This appeal followed. Additional facts will be set forth as necessary.

I

The defendant first claims that the court incorrectly found that the parties to the agreement were not mutually mistaken in regard to the availability of brownfields funding.[11] It contends that the agreement was incapable

[10] The memorandum of decision notes that, at oral argument, Landmark abandoned its claim for any damages relating to delay or lost profits and also indicated orally that it sought damages under CUTPA only for the attorney's fees incurred to try the present case.

[11] The defendant contends for the first time in its reply brief that the essential mistake was the overestimated cost of remediation, which was $1,314,006.82 at the time the contract was made in June, 2005, but was reduced to $265,000 in July, 2006. "It is well established . . . that [c]laims . . . are unreviewable when raised for the first time in a reply brief." (Internal quotation marks omitted.) *DiLieto* v. *County Obstetrics & Gynecology Group, P.C.*, 297 Conn. 105, 129 n.30, 998 A.2d 730 (2010). Accordingly, we

of being performed without the funding, and, therefore, the lack of funding rendered it voidable. We are not persuaded.

"[A] mutual mistake requires a mutual misunderstanding between the parties as to a material fact." *BRJM, LLC* v. *Output Systems, Inc.*, 100 Conn. App. 143, 148, 917 A.2d 605, cert. denied, 282 Conn. 917, 925 A.2d 1099 (2007). A mutual mistake is material when it "effects a result that neither [party] intended." (Internal quotation marks omitted.) *McBurney* v. *Cirillo*, 276 Conn. 782, 815, 889 A.2d 759 (2006), overruled in part on other grounds by *Batte-Holmgren* v. *Commissioner of Public Health*, 281 Conn. 277, 284–89, 914 A.2d 996 (2007). "Whether there has been such mistake is a question of fact. . . . Questions of fact are subject to the clearly erroneous standard of review. . . . A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with a definite and firm conviction that a mistake has been committed. . . . Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings." (Citations omitted; internal quotation marks omitted.) Id., 815–16.

In its memorandum of decision, the court found that the parties were not under a mistaken belief as to the amount or availability of brownfields funding and, additionally, that the unavailability of brownfields funding did not effect an "unconscionable advantage" for either party.[12] Accordingly, it concluded that the mutual mistake defense was unavailing.

review this claim for a mutual mistake as to the availability of funding, not as to the cost of remediation.

[12] The court improperly analyzed the alleged mutual mistake to determine if it produced an unconscionable result. Although the defendant does not claim on appeal that the court applied the incorrect standard, we note, as a point of clarity, that a showing of unconscionable result can be required for a *unilateral* mistake of fact defense; see, e.g., *Bender* v. *Bender*, 292

The defendant argues that both parties assumed there would be brownfields funding and that the eventual lack of funding rendered the agreement voidable by the defendant. It contends that the agreement could not function without brownfields funding because virtually every condition and time sequence in the agreement was tied into the approval of funding. As correctly noted by the trial court, however, the language of the agreement reveals that the parties did not believe that brownfields funding would necessarily be available.[13] Instead, the agreement provided protection for Landmark in the event that the brownfields funding was either minimal or nonexistent. For example, the agreement contained a mortgage contingency clause in case Landmark was not able to secure a favorable interest rate "[d]ue to the uncertainty as to . . . the amount of funding, *if any*, available through [the redevelopment authority] . . . ." (Emphasis added.) Also, Landmark's performance under the agreement was contingent upon its determination in its "sole, absolute, and unfettered discretion" that the brownfields funding would be sufficient to cover the full cost of remediation. Likewise, all of the closing proceeds were to be placed in escrow,

---

Conn. 696, 975 A.2d 636 (2009); however, this "additional requirement" is not required for a *mutual* mistake of fact defense. See 1 Restatement (Second), Contracts § 153, comment (c), p. 395 (1981). The court based its unconscionability analysis on *Texas Co.* v. *Crown Petroleum Corp.*, 137 Conn. 217, 226, 75 A.2d 499 (1950), which did apply unconscionability analysis to a mutual mistake of fact claim but explicitly borrowed it from mistake of law precedents. Given that the defendant in the present case raised a straightforward mutual mistake of fact defense, the appropriate results analysis entails an assessment of whether there was a material, unintended result, not an unconscionable result. See, e.g., *BRJM, LLC* v. *Output Systems, Inc.*, supra, 100 Conn. App. 149.

[13] We note that we are not construing the language of the agreement. Rather, we are reviewing it for evidence underlying the court's factual determination of the question of mistaken belief. See, e.g., *Bender* v. *Bender*, 292 Conn. 696, 732, 975 A.2d 636 (2009) ("[w]hether parties are mistaken about a material term of a contract is a question of fact, and therefore subject to review under the clearly erroneous standard").

which Landmark had the right to utilize "in the event that Brownfields Funding is insufficient to complete the Post-Closing Remediation." Finally, although the defendant correctly notes that some of Landmark's obligations were to be triggered by the redevelopment authority's unconditional approval of brownfields funding, the agreement contained an acceleration clause allowing Landmark to proceed sooner than required by the delineated time periods. In light of these provisions, the court properly found that the agreement contemplated the possibility that brownfields funding would be unavailable and concluded that the parties did not have any mistaken belief on this matter.[14]

On the basis of our review of the record, the trial court's finding that the mutual mistake defense was unavailing was not clearly erroneous.

II

Next, with regard to the finding that the defendant wrongfully terminated the agreement, the defendant claims that the court incorrectly found that (1) the defendant was required to give Landmark thirty days notice[15] before terminating and (2) the defendant's termination was motivated by an offer from a third party, Calco. We are not persuaded by either claim.

---

[14] The court went on to find that, even assuming that the parties were mistaken about the brownfields funding, it would not have adversely affected the defendant because the reduced remediation estimate improved its net profit. This finding was in error. While the reduced remediation estimate was beneficial to the defendant, the lack of brownfields funding was not, given that any remediation cost not covered by the funding would be paid out of the defendant's proceeds. The defendant also argues on appeal that it suffered an adverse result because, without the brownfields funding to trigger the performance of the agreement, it was burdened with the taxes and indebtedness of the property. Because the lack of a mistaken belief is dispositive, however, of the mutual mistake defense, the court's conclusions regarding the impact on the defendant of the reduced remediation costs are not dispositive.

[15] The court mistakenly referred to the notice period as being "twenty" days, but this did not affect its analysis.

## A

The defendant claims that the court incorrectly found that the defendant was required to give thirty days notice of termination, arguing that the notice provision did not apply in the present circumstances. We begin by setting forth the governing legal principles. "[W]here there is definitive contract language, the determination of what the parties intended by their contractual commitments is a question of law. . . . Because a question of law is presented, review of the trial court's ruling is plenary, and this court must determine whether the trial court's conclusions are legally and logically correct, and whether they find support in the facts appearing in the record." (Internal quotation marks omitted.) *Reid* v. *Landsberger*, 123 Conn. App. 260, 271, 1 A.3d 1149 (2010). "[W]e accord the language employed in the contract a rational construction based on its common, natural and ordinary meaning and usage as applied to the subject matter of the contract. . . . Where the language is unambiguous, we must give the contract effect according to its terms. . . . Moreover, in construing contracts, we give effect to all the language included therein, as the law of contract interpretation . . . militates against interpreting a contract in a way that renders a provision superfluous." (Citation omitted; internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, 285 Conn. 1, 13–14, 938 A.2d 576 (2008).

The agreement expressly provided the defendant with the right to terminate the agreement only in the event that Landmark was in default and left that default uncured for thirty days after receiving written notice of default from the defendant. The defendant does not contest that it did not provide thirty days notice of default to Landmark before sending a termination letter

on October 27, 2006.[16] Rather, it contends that this provision was inapplicable because its primary reason for terminating was not a default by Landmark but, instead, the impossibility of performing due to the lack of brownfields funding. Our analysis of the first claim resolves this issue. Because there was no mutual mistake, the defendant's argument that the agreement was incapable of being performed is unavailing. Furthermore, our review of the record confirms the court's finding that, under the agreement, the defendant "did not have the right to terminate the contract because it was dissatisfied with the amount, or even the lack of outside funding." Giving full effect to the termination provisions, the court correctly ruled that the defendant was in breach of contract because it failed to give thirty days notice of default before terminating.

## B

The defendant also claims that the court incorrectly determined that the purchase offer from Calco was a motivation for the termination of the agreement. As a preliminary matter, we address the defendant's contention that the court should not have considered the conduct of the defendant's real estate agent, Calabrese, in its analysis of the termination. The court found that Calabrese was an agent of the defendant within the meaning of agency law and also found that, as a nonparty to the agreement, he did not have the power to terminate it. Seizing on the fact that Calabrese was a nonparty, the defendant argues that none of Calabrese's actions regarding the termination of the agreement were within the scope of his authority and, therefore, are legally insignificant.

---

[16] Some of the defendant's concerns in the termination letter—namely, the brownfields funding, the earnest money deposit and the retainer of the environmental consultant—had been raised in its previous letter of September 12, 2006. The defendant does not assert on appeal, however, that this satisfied the notice requirement under the contract.

"[I]t is a general rule of agency law that the principal in an agency relationship is bound by, and liable for, the acts in which his agent engages with authority from the principal . . . ." *Ackerman* v. *Sobol Family Partnership, LLP*, 298 Conn. 495, 508, 4 A.3d 288 (2010). "Agents who lack authority to bind their principals to contracts nevertheless often have authority to negotiate or to transmit or receive information on their behalf." 1 Restatement (Third), Agency § 1.01, comment (c), p. 19 (2006). It is well settled that "[t]he nature and extent of an agent's authority is a question of fact for the trier where the evidence is conflicting or where there are several reasonable inferences which can be drawn [therefrom]. . . . Accordingly, we review the [trial] court's findings with regard to agency and an agent's [apparent] authority under the clearly erroneous standard." (Citations omitted; internal quotation marks omitted.) *LeBlanc* v. *New England Raceway, LLC*, 116 Conn. App. 267, 273–74, 976 A.2d 750 (2009).

The record reveals that Calabrese acted for the defendant not only in the agreement's formation but also in its implementation. For example, eight weeks after the execution of the agreement, he instructed Barry on monitoring Landmark's performance under the agreement. Additionally, late in the summer of 2006, he negotiated with Calco to produce a new purchase offer more attractive to the defendant and simultaneously met with Landmark, seeking to renegotiate the agreement. There is ample evidence to support the trial court's conclusion that it was within the nature of Calabrese's authority to conduct ongoing contract negotiations on behalf of the defendant.

We next turn to the defendant's claim that the court incorrectly determined that the Calco offer was a motive for the termination of the agreement. This claim arises in the context of the court's determination that

the defendant acted in bad faith in terminating the contract.[17] "[E]very contract carries an implied duty requiring that neither party do anything that will injure the right of the other to receive the benefits of the agreement." (Internal quotation marks omitted.) *Ramirez* v. *Health Net of the Northeast, Inc.*, supra, 285 Conn. 16 n.18. "To constitute a breach of [the implied covenant of good faith and fair dealing], the acts by which a defendant allegedly impedes the plaintiff's right to receive benefits that he or she reasonably expected to receive under the contract must have been taken in bad faith. . . . Bad faith in general implies both actual or constructive fraud, or a design to mislead or deceive another, or a neglect or refusal to fulfill some duty or some contractual obligation, not prompted by an honest mistake as to one's rights or duties, but by some interested or sinister motive." (Citation omitted; internal quotation marks omitted.) *Keller* v. *Beckenstein*, 117 Conn. App. 550, 563–64, 979 A.2d 1055, cert. denied, 294 Conn. 913, 983 A.2d 274 (2009). "Whether a party has acted in bad faith is a question of fact, subject to the clearly erroneous standard of review." *Harley* v. *Indian Spring Land Co.*, 123 Conn. App. 800, 837, 3 A.3d 992 (2010).

As revealed by the record, the defendant's attempts to avoid the agreement increased in proportion to Calco's desire to purchase the property on terms more desirable to the defendant than the pending agreement with Landmark. From this evidence, the court reasonably concluded that the defendant preferred to terminate the

---

[17] Although the words "bad faith" do not appear in the court's discussion of wrongful termination, it made extensive factual findings regarding attempts by the defendant and its agents to woo Calco and to avoid the agreement with Landmark, concluding that these attempts were "not legitimate . . . ." We infer that the court viewed these attempts as "the breach of good faith and the covenant of fair dealing" to which it later referred in its discussion of CUTPA.

agreement with Landmark so that it could sell the property to Calco.[18] Additionally, the court found that, at the time of trial: the $250,000 that accompanied Calco's offer of September 21, 2006, had not been returned; Calco's attorney appeared at the trial; Calco funded the cost of trial; and Henry Chung had assigned his mortgage obligations on the property to Calco.

On appeal, the defendant contests the accuracy of these findings. It asserts that the $250,000 deposit was never held by the defendant, and that there was no evidence that Chung assigned his mortgage obligations to Calco. Barry's testimony, however, contradicted these claims. The defendant also asserts that the Calco offer did not motivate the defendant to terminate the Landmark agreement because: both Calco offers were for less money than the agreement;[19] the defendant never signed a contract with Calco until well after the termination of the agreement; Calco's payment of the trial costs was insignificant; and the defendant did not sign the Calco offer until March, 2007.[20] On review, however, we decline to weigh the evidence. "Because it is the trial court's function to weigh the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not

[18] To summarize those facts, the record reveals that Calco made a first offer in January, 2006; Calabrese negotiated terms of a second offer in late summer; Calabrese and Barry met with Landmark to try to renegotiate the agreement on September 7; Calco made a second offer on September 21; the defendant terminated its agreement with Landmark on October 27; and the defendant executed a contract with Calco on March 6, 2007.

[19] Although it does not appear on the face of the second offer, there was testimony adduced at trial that Calco was willing both to assume the defendant's mortgage obligations and to close much more rapidly than the closing provided in the Landmark agreement. Hence, the court found that the defendant preferred the "quick deal" with Calco.

[20] The defendant also asserts that Calco's attorney did not appear for Calco at the defendant's trial. This is a non sequitur. The court clearly meant that Calco supplied representation to the defendant, which the record confirms.

examine the record to determine whether the [court] could have reached a conclusion other than the one reached. . . . Instead, we make every reasonable presumption . . . in favor of the trial court's ruling." (Internal quotation marks omitted.) *Nappo* v. *Merrill Lynch Credit Corp.*, 123 Conn. App. 567, 572, 2 A.3d 959 (2010). There was ample support in the record for the trial court's finding that the Calco offer was a motive for the defendant's termination of the contract; therefore, that finding was not clearly erroneous.

For the foregoing reasons, the court correctly found that the defendant wrongfully terminated the agreement.

III

The defendant next claims that the court improperly awarded specific performance to Landmark. "Specific performance is an equitable remedy permitting courts to compel the performance of contracts for the sale of real property, and certain other contracts, pursuant to the principles of equity." *Jaramillo* v. *Case*, 100 Conn. App. 815, 828, 919 A.2d 1061, cert. denied, 283 Conn. 902, 926 A.2d 670 (2007). "[T]here is no right to specific performance, but rather [t]he granting of specific performance of a contract to sell land is a remedy which rests in the broad discretion of the trial court depending on all of the facts and circumstances when viewed in light of the settled principles of equity." (Internal quotation marks omitted.) Id. Therefore, our standard of review of this award is abuse of discretion. *Hill* v. *Raffone*, 103 Conn. App. 737, 742, 930 A.2d 788 (2007). Additionally, because a court's decision to grant or to deny the remedy of specific performance in a breach of contract action is fact specific, the underlying factual findings are subject to the clearly erroneous standard of review. Id.

The defendant argues that the order for specific performance was inappropriate because the agreement was too complex and speculative to be enforced easily. He cites and relies on *Hill* v. *Raffone,* supra, 103 Conn. App. 737, in which we held that "the court cannot enforce specific performance of an agreement whose terms are indefinite and uncertain." (Internal quotation marks omitted.) Id., 744. In *Hill,* we affirmed the court's denial of specific performance because an order of specific performance would be "difficult to fashion and a nightmare to enforce" for the following reasons: the parties had argued up to the very end regarding the precise terms of the transaction; the interest rate changes made it difficult to determine appropriate compensation; and the real estate transaction also included the installation of heating systems, which would be difficult for the court to supervise. (Internal quotation marks omitted.) Id.

In contrast, the court in the present case found that the terms of the agreement were definite and certain enough that it ordered that Landmark should "take advantage of the contract terms" to either terminate the agreement or to close immediately on the property. Furthermore, unlike *Hill,* the court would not need to supervise the environmental remediation in the present case because remediation was to occur after the closing and to be paid for out of the escrow account. Therefore, the court's factual finding that this agreement was amenable to specific performance was not clearly erroneous.

The defendant also argues that specific performance was inappropriate because Landmark lacked the financial ability to purchase the property.[21] Specifically, the

---

[21] The cases cited by the defendant analyze whether the buyer was able to perform *at the time of closing,* not at the time the action commenced, as the defendant asserts. See *DiBella* v. *Widlitz,* 207 Conn. 194, 200–201, 541 A.2d 91 (1988); *Frumento* v. *Mezzanotte,* 192 Conn. 606, 615–16, 473 A.2d 1193 (1984). The precise rule is as follows: a buyer requesting an

defendant contends that the court incorrectly imputed to Landmark the assets of the wife of its manager. "It is well settled that a buyer seeking specific performance has the burden of proving that he or she is ready, willing and able to purchase the premises, even when a seller . . . has failed to satisfy a condition of the contract." (Internal quotation marks omitted.) *Jaramillo* v. *Case*, supra, 100 Conn. App. 829. While the determination of financial "ability" is a question of fact; *Steiner* v. *Bran Park Associates*, 216 Conn. 419, 424, 582 A.2d 173 (1990); "where the legal conclusions of the court are challenged, we must determine whether they are legally and logically correct and whether they find support in the facts set out in the memorandum of decision . . . ." (Internal quotation marks omitted.) *Frumento* v. *Mezzanotte*, 192 Conn. 606, 617–18, 473 A.2d 1193 (1984).

At trial, Landmark adduced evidence that, during the relevant time period, one of Landmark's owners had sufficient cash on deposit to close on the property.[22]

order for specific performance must demonstrate "readiness, willingness and ability to perform its promises as contained in the agreement . . . ." *Eastern Consolidators, Inc.* v. *W. L. McAviney Properties, Inc.*, 159 Conn. 510, 511, 271 A.2d 59 (1970).

[22] Glenn Russo, Landmark's manager, testified as follows:

"[Landmark's Counsel]: Mr. Russo, does Alicia Russo have any involvement in any capacity as an owner or officer in Landmark Investment?

"[The Witness]: She is an owner—a limited partner, yes.

"[Landmark's Counsel]: In terms of doing business, is there any established role that she plays as an owner in the company when it comes to financing?

"[The Witness]: The company borrows money from time to time for different projects from Alicia Russo, whether or not my wife is an owner, at that time, of the company, I'm not sure because sometimes she was an owner for times and sometimes she's not, so it does change from time to time, but she has repeatedly lent money to many of the projects which Landmark Investment has been involved in."

The defendant adduced no evidence to disprove the assertion that Alicia Russo was one of Landmark's owners, nor does the defendant challenge the merit of this assertion in its brief, other than to refer to her as Glenn Russo's "wife" rather than as an owner. "We consistently have held that [a]nalysis, rather than mere abstract assertion, is required in order to avoid abandoning an issue by failure to brief the issue properly." (Internal quotation marks omitted.) *Paoletta* v. *Anchor Reef Club at Branford, LLC*, 123

The defendant, relying on *Frumento* v. *Mezzanotte,* supra, 192 Conn. 606, contends that, because this owner was the wife of Landmark's manager, these cash assets could not be imputed to Landmark. The plaintiff in *Frumento* asserted that he was financially able to close because he could borrow the purchase money from his parents. Id., 615. There, the court found this fact insufficient to prove financial ability, and our Supreme Court affirmed, holding that "when a purchaser of land is left to depend upon a purchase price loan from a third party who is in no way bound to furnish such funds, the purchaser cannot be considered to be able to perform so as to be entitled to specific performance." Id., 617. In the present case, however, the party who held sufficient funds to complete the purchase was not a third party but, rather, an owner of Landmark and a repeated source of funding for its development projects. Although it is not clear in the memorandum of decision whether the court relied on this evidence in finding that Landmark "had the cash on hand to meet the contract price," insofar as the court did so, the imputation was not improper. Furthermore, Landmark adduced other evidence of financial ability, namely, two bank loan agreements for other properties that it was developing during the relevant time period, one for $6 million and the other for $22,750,000.[23] Accordingly, the court's finding of financial ability was not clearly erroneous. See *O'Sullivan* v. *Bergenty,* 214 Conn. 641, 653–54, 573 A.2d 729 (1990) (affirming trial court's determination that buyer's ready access to credit proved financial ability to perform). For the foregoing reasons, the court did not abuse its discretion in ordering specific performance of the agreement.

---

Conn. App. 402, 406, 1 A.3d 1238, cert. denied, 298 Conn. 931, 5 A.3d 491 (2010). Therefore, we assume that Alicia Russo was an owner of Landmark.

[23] Landmark had not yet applied for a loan on the property itself because the contract time lines were stalled by the defendant's tardiness in producing the action plan.

## IV

The defendant next claims that the court incorrectly found it in violation of CUTPA. In this regard, the defendant makes three distinct claims: (1) the court incorrectly applied CUTPA to the transaction because the sale of the property was incidental to the defendant's main business, (2) the conduct of its attorney, Barry, and its real estate agent, Calabrese, could not reasonably be imputed to it for purposes of assigning CUTPA liability, and (3) the court's findings were incorrect and insufficient to establish a CUTPA violation. We are not persuaded.

We begin by setting forth the standard of review. CUTPA provides that "[n]o person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce." General Statutes § 42-110b (a). "It is well settled that whether a defendant's acts constitute . . . deceptive or unfair trade practices under CUTPA, is a question of fact for the trier, to which, on appellate review, we accord our customary deference. . . . [W]here the factual basis of the court's decision is challenged we must determine whether the facts set out in the memorandum of decision are supported by the evidence or whether, in light of the evidence and the pleadings in the whole record, those facts are clearly erroneous." (Internal quotation marks omitted.) *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, 93 Conn. App. 486, 520, 890 A.2d 140, cert. denied, 277 Conn. 928, 895 A.2d 798 (2006).

## A

We begin with the defendant's claim that the court incorrectly applied CUTPA to the transaction because the sale of the property was incidental to the defendant's main business. "To state a claim under CUTPA, the plaintiff must allege that the actions of the defendant

were performed in the conduct of trade or commerce. . . . Moreover, a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce." (Citations omitted; internal quotation marks omitted.) *Sovereign Bank* v. *Licata*, 116 Conn. App. 483, 493–94, 977 A.2d 228, cert. granted on other grounds, 293 Conn. 935, 981 A.2d 1080 (2009). Our review of this issue is plenary. *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, supra, 93 Conn. App. 521 ("[w]hether the defendant is subject to CUTPA is a question of law, not fact" [internal quotation marks omitted]).

The court found on the basis of the defendant's articles of organization that its main commercial endeavor was real estate development. In opposition to that finding, the defendant argues that its owner, Chung, was a lifelong restaurateur whom the court found to be unfamiliar with the complexity and expense of developing the property, its sole asset. It argues that its business had literally ceased and that it was selling the property out of desperation and, consequently, that the transaction was incidental to that business. In support it cites *McCann Real Equities Series XXII, LLC* v. *David McDermott Chevrolet, Inc.*, supra, 93 Conn. App. 523 (sale of real property incidental where defendant's main business was car dealership). We find no support in *McCann Real Equities Series XXII, LLC*, however, for the proposition that the sale of assets of an unprofitable business is incidental to that business. Furthermore, as the court noted in its memorandum of decision, the defendant at hand is Chung Family Realty Partnership, LLC, not Chung. The defendant's articles of organization state that its purposes are "to acquire, manage, lease, and develop real property and related assets," and it attempted to develop the property. These facts amply support the court's finding that real estate development

was the defendant's main commercial endeavor. There-
fore, the court properly determined that the sale of
this development property fell within the protection
afforded by CUTPA.

B

We turn next to the defendant's claim that the con-
duct of its attorney, Barry, and its real estate agent,
Calabrese, could not reasonably be imputed to it for
purposes of assigning CUTPA liability. As to Barry, the
defendant argues that because attorneys are not liable
under CUTPA for their professional conduct, then a
client likewise cannot be liable under CUTPA for its
attorney's conduct. It also argues that because Cala-
brese had no authority to terminate the agreement, his
conduct in this regard cannot be imputed to the defen-
dant. We are not persuaded.

We begin with the appropriate standard of review.
"Because a question of law is presented, review of the
trial court's ruling is plenary, and this court must deter-
mine whether the trial court's conclusions are legally
and logically correct, and whether they find support in
the facts appearing in the record." (Internal quotation
marks omitted.) *Reid* v. *Landsberger*, supra, 123 Conn.
App. 271.

The defendant argues that holding a client liable
under CUTPA for the actions of its attorney would
interfere with the attorney's representation. As a matter
of policy, "[we seek] to avoid any rule that would inter-
fere with the attorney's primary duty of robust represen-
tation of the interests of his or her client." (Internal
quotation marks omitted.) *Suffield Development Asso-
ciates Ltd. Partnership* v. *National Loan Investors,
L.P.*, 260 Conn. 766, 784, 802 A.2d 44 (2002). Conse-
quently, while attorneys are not immune from CUTPA
claims, CUTPA applies only to the entrepreneurial
aspects of the practice of law. Id., 783. Attorneys have

no personal liability under CUTPA for malpractice, whether negligent or intentional; id., 784; or for their representation of the plaintiff's opponent. *Jackson* v. *R. G. Whipple, Inc.*, 225 Conn. 705, 727–28, 627 A.2d 374 (1993). These exemptions, however, do not apply in the present case because the defendant is not an attorney. The question before the trial court, and us on review, is not whether an attorney may be held liable under CUTPA but, rather, whether the conduct of an attorney acting in an agency capacity may be attributed to his or her principal for CUTPA purposes. Because the question we face does not involve whether an attorney may be held liable under CUTPA for his or her representational conduct, we need not concern ourselves with the conclusory allegation by the defendant that holding it liable for counsel's conduct performed on its behalf could have a chilling effect on vigorous representation. Thus, the defendant's argument in this regard is unavailing.

The defendant also mistakenly asserts that there is no authority to support the imputation of an attorney's acts to his client to support a CUTPA violation. "Connecticut courts have applied general principles of agency law to determine whether to hold a principal liable for the acts of its agent under CUTPA." *Sheltry* v. *Unum Life Ins. Co. of America*, 247 F. Sup. 2d 169, 181 (D. Conn. 2003), citing *Pollock* v. *Panjabi*, 47 Conn. Sup. 179, 200, 781 A.2d 518 (2000).[24] Furthermore, the

---

[24] In its treatise on unfair trade practices, the Connecticut Practice Series states: "Unlike the Connecticut Antitrust Act [General Statutes § 35-24 et seq.], CUTPA does not expressly provide that a corporation *or other legal entity* is liable for the acts of the officers, directors, representatives or agents acting within the scope of their actual or apparent authority. A corporation is a distinct legal entity that can act only through its agents. A corporation may be directly liable under CUTPA if the corporation, as a principal, authorized or ratified the specific wrongful conduct. A corporation may also be held vicariously liable under the doctrine of respondeat superior if the person actually committing the violation was a servant of the corporation when the acts were committed, and the acts were committed within the scope of the servant's employment and in furtherance of the corporation's

relationship between attorneys and their clients is one of agency. *Ackerman* v. *Sobol Family Partnership, LLP,* supra, 298 Conn. 509; see also 1 Restatement (Third), supra, § 1.01, comment (c). "The general rule is that the acts of an attorney are imputed to a client when they are performed in the furtherance of the business for which the attorney has been retained." *Allen* v. *Nissley,* 184 Conn. 539, 542–43, 440 A.2d 231 (1981). For example, in one such agency case, the defendant's attorney drafted a contract of sale designating himself as the person to receive the plaintiff's deposit, and the defendant ratified the acts of his attorney by signing the contract. *Kallas* v. *Harnen,* 48 Conn. App. 253, 255, 709 A.2d 586, cert. denied, 244 Conn. 935, 717 A.2d 232 (1998), superseded by statute in part on other grounds as stated in *Young* v. *Young,* 64 Conn. App. 651, 655 n.6, 781 A.2d 342, cert. denied, 258 Conn. 908, 782 A.2d 1255 (2001). When the plaintiff demanded that the defendant return his deposit in accordance with the contract, the defendant refused on the ground that he had never held the deposit. Id. In affirming the judgment for the plaintiff, the court noted that "[t]he acts of an agent are imputed to his principal, and a principal may not use his agent as a shield when the agent acts within the bounds of his authority." Id., 260 n.5.

In the present case, the defendant does not contest that Barry was acting within the scope of his authority as the defendant's attorney during the ongoing negotiations with both Landmark and Calco. Although Barry is not personally liable to Landmark under CUTPA, the defendant may not use Barry's professional conduct exemption to shield itself from CUTPA liability for the acts of its agent. Therefore, the court properly imputed Barry's actions to the defendant for the purpose of establishing a CUTPA violation.

---

business." (Emphasis added.) R. Langer, J. Morgan & D. Belt, 12 Connecticut Practice Series: Unfair Trade Practices (2003) § 6.7, p. 425.

Likewise, the tenet that principals are liable under CUTPA for the acts of their agents applies to Calabrese. As we noted in our preceding analysis, it was within the nature of Calabrese's authority as the defendant's agent to conduct ongoing contract negotiations on its behalf.[25] Therefore, the defendant properly may be held responsible under CUTPA for Calabrese's actions to the same extent that it is accountable for the conduct of its attorney.

## C

We turn finally to the defendant's claim that the court incorrectly concluded that the defendant violated CUTPA on the basis of incorrect and insufficient findings. "It is well settled that in determining whether a practice violates CUTPA we have adopted the criteria set out in the cigarette rule by the federal trade commission for determining when a practice is unfair: (1) [W]hether the practice, without necessarily having been previously considered unlawful, offends public policy as it has been established by statutes, the common law, or otherwise—in other words, it is within at least the penumbra of some common law, statutory, or other established concept of unfairness; (2) whether it is immoral, unethical, oppressive, or unscrupulous; (3) whether it causes substantial injury to consumers, [competitors or other businesspersons]. . . . All three criteria do not need to be satisfied to support a finding of unfairness. A practice may be unfair because of the degree to which it meets one of the criteria or because to a lesser extent it meets all three. . . . Thus a violation of CUTPA may be established by showing either an actual deceptive practice . . . or a practice amounting to a violation of public policy." (Internal quotation marks omitted.) *Harris* v. *Bradley Memorial Hospital & Health Center, Inc.*, 296 Conn. 315, 350–51, 994 A.2d 153 (2010). Notably, "not every contractual

---

[25] See part II B of this opinion.

breach rises to the level of a CUTPA violation." (Internal quotation marks omitted.) *Naples* v. *Keystone Building & Development Corp.*, 295 Conn. 214, 228, 990 A.2d 326 (2010). "In the absence of aggravating unscrupulous conduct, mere incompetence does not by itself mandate a trial court to find a CUTPA violation." Id., 229 (contractors not liable under CUTPA for unworkmanlike construction because there were no aggravating factors); see also *Lydall, Inc.* v. *Ruschmeyer*, 282 Conn. 209, 248, 919 A.2d 421 (2007) (reversing trial court's finding of CUTPA violation because there were no aggravating circumstances).

In the present case, the court found that the defendant dealt with Landmark in bad faith, culminating in the defendant's wrongful termination of the agreement. The court found, as well, that "[f]or the following reasons . . . the breach of good faith and the covenant of fair dealing falls within the protection of CUTPA" and listed nine aggravating circumstances in support of its finding: (1) the defendant agreed to produce an action plan that it could not financially afford to produce and failed to inform Landmark; (2) a mere two months into the agreement, on August 31, 2005, the defendant's real estate agent, Calabrese, wrote to the defendant's attorney, Barry, for advice as to whether the defendant had a way out of the agreement; (3) the defendant entertained interest in the property and took a deposit from Calco, a third party, without informing Landmark, which was expensively pursuing tenants and development; (4) at the time of Calabrese's inappropriate outburst at the September 7, 2006 meeting with Landmark stating that the "contract was over" and "Landmark had to pay" for the cleanup, Calabrese knew that Calco was willing to purchase the property on terms more desirable to the defendant's owner, terms that had been suggested by Calabrese; (5) Barry's letter of July 25, 2006, made the following representations,

which were factually and legally incorrect: that the defendant always believed that the brownfields funding would cover all the cleanup costs, which Barry conceded at trial was not his own belief at the time; that the town would not participate in the brownfields application, which was not certain at the time; and that Landmark had not met its requirements under the agreement, which was untrue because the defendant's actions had prevented the time lines from being triggered; (6) when the town indicated that it would reconsider its nonparticipation in the brownfields application, Barry told the town that Landmark was in breach, influencing the town never to make another offer; (7) after Landmark's attorney replied to the letter of July 25, 2006, Barry responded on August 23, 2006, that the agreement was "impossible" to perform and that a new agreement was necessary, which was not legally correct; (8) Barry stated at the meeting of September 7, 2006, that the "contract is null and void," which was untrue because, even assuming mutual mistake, the agreement would have been voidable, not void; also at that meeting, Calabrese shouted angrily at Landmark's attorney and agent when they attempted to explain that the agreement could be performed to the defendant's benefit; and (9) the defendant and its agents and representatives wrongfully terminated the agreement and failed to give the required thirty days notice[26] of the termination. On appeal, the defendant contends that none of these nine findings is factually or legally supportable.

The defendant's challenges to these findings can be grouped into three categories: agency of Barry and Calabrese, semantics of the court's statement of these findings, and weight of the evidence. Regarding agency, the defendant contends that in the letter of August 31, 2005,

---

[26] The court mistakenly referred to the notice period as being twenty days. See footnote 15 of this opinion.

and at the meeting of September 7, 2006, Calabrese had no authority and Barry's conduct could not contribute to a CUTPA violation. Given our preceding analysis of the agency issues, however, we conclude that the court properly imputed the acts of Barry and Calabrese to the defendant. Regarding semantics, the defendant contends that Calco had no "interest" in the property in a legal sense, that the defendant never "took" a deposit from Calco, and that the town did "reconsider" its nonparticipation in the brownfields application. In each instance, however, the disputed phrasing is irrelevant because the court's meaning is clear: the defendant knew that Calco was interested in purchasing the property and that Calco had deposited earnest money in a trustee account, and the town was influenced by the defendant never to make another offer. Finally, regarding weight, the defendant makes the following contentions: the fact that the defendant agreed to obligations that it could not afford was knowable by Landmark, which could have terminated if that fact was significant; the fact that Calco wanted to purchase the property was insignificant because Calco was a nonparty; the fact that the defendant knew Calco wanted to purchase the property on more favorable terms was insignificant because Chung testified that he would not contract with Calco while under contract with Landmark; the fact that Barry made incorrect representations in the letters of July 25 and August 23, 2006, was insignificant because Barry believed these in good faith; the fact that Barry mistakenly called the agreement "void" was insignificant because he believed it was voidable and was expressing his intention to void it; and the court's finding that the defendant terminated wrongfully was unsupportable because the defendant felt that the agreement was voidable. We decline to reassess the significance or credibility of the evidence adduced at trial. "Because it is the trial court's function to weigh

the evidence and determine credibility, we give great deference to its findings. . . . In reviewing factual findings, [w]e do not examine the record to determine whether the [court] could have reached a conclusion other than the one reached." (Internal quotation marks omitted.) *Nappo* v. *Merrill Lynch Credit Corp.*, supra, 123 Conn. App. 572. There is ample support in the record for these findings, and, thus, they are not clearly erroneous.

Finally, the defendant argues that even if one or more of these findings is correct, they are not sufficiently grave to establish a CUTPA violation. This court has held that a single act of misconduct may constitute a violation of CUTPA. *Johnson Electric Co.* v. *Salce Contracting Associates, Inc.*, 72 Conn. App. 342, 344, 805 A.2d 735, cert. denied, 262 Conn. 922, 812 A.2d 864 (2002). In the present case, there were multiple such acts. The court's findings reveal that the defendant engaged in a pattern of bad faith conduct, seeking to escape its contractual obligations unfairly while negotiating a more favorable offer with Calco, a third party. Given the wrongful termination and the aggravating circumstances, there is ample support for the trial court's conclusion that the defendant's actions violated CUTPA. Therefore, the court's finding of a CUTPA violation was not clearly erroneous.

The judgment is affirmed.

In this opinion the other judges concurred.