******************************************************

The "officially released" date that appears near the beginning of each opinion is the date the opinion will be published in the Connecticut Law Journal or the date it was released as a slip opinion. The operative date for the beginning of all time periods for filing postopinion motions and petitions for certification is the "officially released" date appearing in the opinion.

All opinions are subject to modification and technical correction prior to official publication in the Connecticut Reports and Connecticut Appellate Reports. In the event of discrepancies between the advance release version of an opinion and the latest version appearing in the Connecticut Law Journal and subsequently in the Connecticut Reports or Connecticut Appellate Reports, the latest version is to be considered authoritative.

The syllabus and procedural history accompanying the opinion as it appears in the Connecticut Law Journal and bound volumes of official reports are copyrighted by the Secretary of the State, State of Connecticut, and may not be reproduced and distributed without the express written permission of the Commission on Official Legal Publications, Judicial Branch, State of Connecticut.

******************************************************

# NRT NEW ENGLAND, LLC *v*. SALVATORE
# R. LONGO ET AL.
## (AC 43285)

Bright, C. J., and Cradle and Suarez, Js.

*Syllabus*

The plaintiff, a commercial property broker, sought to recover damages from the defendants for, inter alia, breach of contract in connection with the defendants' failure to pay a real estate commission. The defendants listed certain property with the plaintiff through its affiliated licensed sales associates, F and P, and executed an exclusive right to sell agreement for a term of one year. Although the defendants entered into a purchase and sale agreement with a buyer, E Co., during the term of the listing agreement, that deal was cancelled. As such, the property was not sold when the listing agreement expired, and the defendants then entered into an exclusive listing agreement with L, one of the defendants who held a real estate broker's license. Eventually, the defendants and E Co. closed on the sale of the property, and the plaintiff brought an action alleging breach of contract and violations of the Connecticut Unfair Trade Practices Act (§ 42-110a et seq.), seeking to recover its commission pursuant to the listing agreement. Following a trial to the court, the trial court found for the plaintiff, and the defendants appealed to this court. *Held*:

1. The trial court properly refused to dismiss the plaintiff's action for lack of standing, the court having jurisdiction to consider the plaintiff's claims: contrary to the defendants' contention, the plaintiff's failure to strictly comply with the licensing requirements of the statute (§ 20-325a) governing actions to recover real estate commissions did not implicate the court's subject matter jurisdiction, as certain amendments to § 20-325a, enacted after the Supreme Court's decision in *McCutcheon & Burr, Inc.* v. *Berman* (218 Conn. 512), permit recovery of a commission upon proof of substantial compliance with the requirements of the statute and that denial of a comission would be inequitable.

2. The trial court improperly concluded that the defendants had breached the listing agreement, the court having made a clearly erroneous finding on which it based its conclusion: the trial court found that L caused the plaintiff to lose the opportunity to negotiate with E Co. during the final full month of the listing agreement, but, contrary to the court's finding, the uncontradicted evidence showed that P, on behalf of the plaintiff, was an active participant and took the lead in negotiations through the end of the term of the listing agreement, and this court was left with the definite and firm conviction that the court's finding that the plaintiff was taken out of the negotiations during the last month of the listing agreement was a mistake; moreover, the court's memorandum of decision made clear that the court's clearly erroneous factual finding was the basis for its conclusion that the defendants breached the listing agreement and caused the plaintiff to suffer damages, such that the court's clearly erroneous finding was not harmless.

3. The trial court improperly concluded that the defendants violated CUTPA, as the court's conclusion that the actions of the defendants were performed in the conduct of trade or commerce for purposes of that statutory scheme was legally incorrect: the court found that L, using his real estate broker's license, inserted himself as the broker of record on the day after the listing agreement expired and, thus, engaged in trade or commerce, but all the acts alleged in the complaint and that the court determined to be CUTPA violations occurred before that date, and, consequently, at the time that L and the other defendants engaged in conduct that the court described as unscrupulous, immoral, unfair and deceptive, none of them did so while engaged in trade or commerce for purposes of CUTPA; moreover, the plaintiff's reliance on *Larsen Chelsey Realty Co.* v. *Larsen* (232 Conn. 480) was misplaced, because, unlike the situation in that case in which both the defendant and the plaintiff were acting as real estate brokers, in this case, at least during the term of the listing agreement, the defendants were acting as owners

of the property and did not need a broker's license to discuss the sale of their property with any prospective buyers, and, although the terms of the listing agreement may have obligated them to refer any such inquiries to the plaintiff, their failure to do so would not have consituted their participation in trade or commerce for purposes of CUTPA.

Argued January 11—officially released September 21, 2021

*Procedural History*

Action to recover damages for, inter alia, breach of contract, and for other relief, brought to the Superior Court in the judicial district of Fairfield, where the defendants Anthony Longo and The Higgins Group, Inc., were defaulted for failure to appear; thereafter, the matter was tried to the court, *Hon. Alfred J. Jennings*, judge trial referee; judgment for the plaintiff, from which the named defendant et al. appealed to this court. *Reversed*; *judgment directed*.

*James H. Lee*, for the appellants (named defendant et al.).

*Thomas E. Crosby*, for the appellee (plaintiff).

*Opinion*

BRIGHT, C. J. The defendants[1] Salvatore R. Longo, Anthony Longo, Salvatore Longo & Sons, LLC, and the estate of Salvatore Longo, Jr., appeal from the judgment of the trial court, rendered following a trial to the court, in favor of the plaintiff, NRT New England, LLC, doing business as Coldwell Banker Residential Brokerage, relating to the sale of commercial property owned by the defendants. On appeal, the defendants claim that the court erred in (1) concluding that the plaintiff had standing to bring an action for a real estate commission, (2) finding that the defendants breached the operative exclusive right to sell listing agreement, and (3) concluding that the defendants had violated the Connecticut Unfair Trade Practices Act (CUTPA), General Statutes § 42-110a et seq. Although we disagree with the defendants' standing claim, we agree with their second and third claims. Accordingly, we reverse the judgment of the trial court.

The following procedural history, factual allegations from the operative amended complaint, and certain facts discernible from the record are relevant to this appeal. The defendants were the owners of several parcels of real property located in Stamford that the parties refer to collectively as "220 West Avenue," which, in addition to 220 West Avenue, includes 0 West Avenue, 0-A Piave Street, 0-B Piave Street, 18 Piave Street, and 143 Leon Place (property). On October 31, 2013, the defendants listed the property for sale with the plaintiff at an asking price of $3,799,000. In connection with the listing, the defendants executed an exclusive right to sell agreement (listing agreement) for the property in which the defendants hired the plaintiff and its affiliated licensed sales associates, Kelly Feda and Joseph Porricelli, to procure a buyer for the property.[2] The listing agreement was for a term of one year and expired on October 31, 2014.

Pursuant to the listing agreement, the defendants agreed that during the term of the listing agreement, the plaintiff would have the sole and exclusive right to list, market, sell and/or rent the property for the price, terms, and conditions set forth therein. The defendants agreed to pay the plaintiff 5 percent of the gross sale price of the property as a commission if, during the term of the listing agreement, (1) the plaintiff procured a buyer who was ready, willing and able to buy the property or any part thereof, even if the defendants refused to accept such an offer for any reason, or (2) the property or any part thereof, was sold, conveyed or became subject to an agreement to purchase or option to purchase, through the efforts of anyone, including the defendants, to anyone, including a co-owner of the property. In addition, the plaintiff would receive its 5 percent commission if the property or any part thereof, was sold, conveyed or became subject to

an agreement to purchase or option to purchase within 180 days after the term of the listing agreement to anyone who was introduced to the property prior to the expiration of the term of the listing agreement, but only if the defendants did not owe a commission to another broker arising out of a subsequent listing agreement.

On or about August 3, 2014, during the term of the listing agreement, the defendants entered into a purchase and sale agreement with Empire Residential, LLC (Empire), in which Empire agreed to purchase the property from the defendants for $2,850,000. The Higgins Group, Inc. (The Higgins Group), a Connecticut corporation, and its affiliated real estate salesperson, Mihaela Kolich, represented Empire as its buyer's agency and agent, respectively, in the purchase transaction. The purchase and sale agreement identified Feda and Porricelli as the defendants' brokers, and stated that they and Kolich were the brokers who negotiated the sale of the property. Empire eventually cancelled the August, 2014 purchase and sale agreement when a discrepancy arose as to the acreage the defendants would convey. As a result, the property had not been sold when the listing agreement expired on October 31, 2014.

On November 1, 2014, the defendants entered into an exclusive listing agreement with "Salvatore R. Longo, Broker" to sell the property. The agreement ran from November 1, 2014, to November 1, 2015, and set a listing price of $3,200,000. On or about January 23, 2015, the defendants entered into a second purchase and sale agreement to sell the property to Empire, this time at a price of $2,760,000.

In June, 2015, pursuant to General Statutes § 20-325a, the plaintiff recorded a notice of and claim for a broker's lien for its commission against the defendants and the property in the Stamford land records. On March 24, 2016, the plaintiff, the defendants, The Higgins Group, and the defendants' attorney, Mark F. Katz, entered into an escrow agreement in which the plaintiff agreed to release its broker's lien in order to permit Empire to purchase the property from the defendants. Under the escrow agreement, Attorney Katz would hold $138,000, the plaintiff's claimed commission from the sale, in escrow. The agreement further provided that, after the closing, any one of the parties could file a lawsuit to obtain a determination with respect to the proper disposition of the funds in escrow and to resolve all of the plaintiff's claims to the commission. On the same day, the defendants closed on the sale of the property to Empire, and Empire paid the defendants $2,760,000 for the property. In December, 2016, the plaintiff brought this action seeking to recover its commission pursuant to the listing agreement.

In May, 2017, the plaintiff filed a two count amended complaint alleging breach of contract and violations of CUTPA. In its breach of contract claim, the plaintiff

alleged that it had performed all of its obligations under the listing agreement and that it is due a commission from the defendants in the amount for $138,000. In its CUTPA claim, the plaintiff alleged that the defendants were engaged in the conduct of trade or commerce, which included the sale and development of the property, and that they had engaged in unfair and deceptive acts or practices by engaging in unethical, immoral, illegal, and unscrupulous conduct. In its request for relief, the plaintiff sought, inter alia, compensatory damages, punitive damages, and attorney's fees. The defendants filed an answer, special defenses, and a counterclaim in which they alleged claims of misrepresentation, forgery, fraud, and violations of CUTPA.[3]

A trial to the court was held over the course of two days on September 11 and 12, 2018. On December 12, 2018, the parties filed posttrial briefs. In addition to arguing that the plaintiff had failed to prove any breach of the listing agreement, the defendants claimed in their brief, pursuant to § 20-325a (a), that the plaintiff was not entitled to a commission because it failed to prove that, at the time it rendered the services on which its claim was based, it was properly licensed, pursuant to General Statutes § 20-312,[4] to provide such services. The defendants argued that, based on this failure, the plaintiff lacked standing to bring this action, and, consequently, the court lacked subject matter jurisdiction over the case and should dismiss it.

In April, 2019, the court issued its memorandum of decision ruling in favor of the plaintiff. In its decision, the court found that there was undisputed evidence that the plaintiff was licensed, in accordance with §§ 20-312 and 20-325a. The court then examined the plaintiff's breach of contract claim and concluded that the plaintiff had failed to prove its claim for a commission pursuant to the pleaded provisions of the listing agreement.[5] The court found, however, that Salvatore R. Longo (Longo) had instructed Empire to cease all communication with the plaintiff and to negotiate solely with him. The court held that Longo's directive to Empire constituted a breach of the listing agreement because it caused the plaintiff to lose any opportunity to participate in the effort to negotiate the sale to Empire during the final month of the exclusive listing agreement with the plaintiff. Last, the court held that Longo's instruction to Empire constituted a violation of CUTPA, finding that Longo's directive to Empire was preceded by misrepresentations or "nonrepresentations" as to the true ownership status of the property, the interfamily litigation background, and a mortgage on the property that led to a foreclosure case and judgment during the negotiations with Empire. The court held that these actions constituted violations of CUTPA and awarded compensatory and punitive damages to the plaintiff.

In May, 2019, Longo filed a motion to reargue and

reconsider, arguing, inter alia, that the plaintiff lacked standing to commence the action. Longo claimed that the court erroneously found that the plaintiff, through its designated broker/realtor Brendan Grady, was licensed, in accordance with §§ 20-312 and 20-325. He argued that Grady was neither a plaintiff nor a party to the action and that, because there was no evidence presented during the trial showing that the plaintiff was a licensed real estate broker, the plaintiff lacked standing to commence the action.

In its memorandum of decision on the motion to reargue and reconsider, the court concluded that its finding that the plaintiff had established that it was licensed as a real estate broker had been erroneous. The court, however, then held that it would be inequitable to deny the plaintiff recovery of the commission that it claims in the present action. The court relied on our Supreme Court's opinion in *Location Realty, Inc.* v. *General Financial Services, Inc.*, 273 Conn. 766, 781, 873 A.2d 163 (2005), in which the court held that a corporate broker licensee's failure to be duly licensed is not a disqualifying factor, but rather is only one of the facts and circumstances to be considered in determining if it would be inequitable to deny recovery of the claimed commission. The trial court found that the plaintiff substantially complied with the licensing requirements of § 20-312 and concluded that it would be inequitable to deny the recovery of a commission due to the plaintiff's failure to prove that it had been licensed when the plaintiff and its personnel otherwise had complied with the remaining applicable and more stringent licensing requirements. Moreover, the court concluded that it would be inequitable to deny the plaintiff recovery because Longo's actions during the last month of the exclusive listing period interfered with the plaintiff's ability to participate in negotiations with Empire and constituted egregious and inequitable conduct. This appeal followed.

On appeal, the defendants claim that the trial court improperly (1) refused to dismiss the plaintiff's action for lack of standing, (2) concluded that the defendants had breached the listing agreement, and (3) concluded that the defendants violated CUTPA. Additional facts will be set forth as necessary.

I

The defendants first claim that the court improperly refused to dismiss the plaintiff's action for lack of standing. Specifically, the defendants argue that the court misinterpreted § 20-325a (d),[6] which the defendants contend only grants standing to licensees. In response, the plaintiff does not dispute that it failed to present evidence at trial that it is duly licensed for purposes of § 20-325a (a). Instead, it argues that the failure to comply with § 20-325a does not implicate the trial court's subject matter jurisdiction and that it would be inequita-

ble to deny the plaintiff recovery because it substantially complied with § 20-325a. We agree with the plaintiff that compliance with § 20-325a does not implicate the court's subject matter jurisdiction.[7]

We first set forth the applicable standard of review and legal principles governing our analysis. "Standing is the legal right to set judicial machinery in motion. One cannot rightfully invoke the jurisdiction of the court unless he [or she] has, in an individual or representative capacity, some real interest in the cause of action, or a legal or equitable right, title or interest in the subject matter of the controversy. . . . Where a party is found to lack standing, the court is consequently without subject matter jurisdiction to determine the cause. . . . Our review of this question of law is plenary." (Internal quotation marks omitted.) *Castle* v. *DiMugno*, 199 Conn. App. 734, 747, 237 A.3d 731 (2020).

Our Supreme Court concluded in *McCutcheon & Burr, Inc.* v. *Berman*, 218 Conn. 512, 590 A.2d 438 (1991), that the trial court was not deprived of subject matter jurisdiction to consider a claim for a real estate commission based on a listing agreement that did not comply with § 20-325a (b). Specifically, the court noted: "The defendants argued, and the trial court agreed, that it lacked subject matter jurisdiction over the plaintiff's claim because the listing agreement did not comply with § 20-325a (b). None of the cases in which we have addressed a failure to comply with § 20-325a (b), however, has involved a motion to dismiss because of a lack of subject matter jurisdiction. . . . Furthermore, we are unaware of any cases in which the failure of a listing agreement to satisfy the requirements of § 20-325a (b) was found to create a jurisdictional bar to an action based on that agreement.[8] An action to enforce a listing agreement is essentially a breach of contract claim, and the trial court clearly [has] subject matter jurisdiction over such a claim." (Citations omitted; footnote in original; internal quotation marks omitted.) Id., 526–27. The court reached this conclusion despite also concluding that "the requirements of § 20-325a (b) are mandatory rather than permissive and that the statute is to be strictly construed."[9] Id., 520.

The court's analysis in *McCutcheon & Burr, Inc.*, is equally applicable to the defendants' claim that the plaintiff has failed to comply with § 20-325a (a). The defendants' argument is that the plaintiff failed to prove a necessary element of its claim, namely that it was licensed to provide the services on which its commission claim is based. Failure to prove a necessary element of a claim does not deprive the court of subject matter jurisdiction; it simply means that the plaintiff cannot succeed due to a failure of proof. See, e.g., *Gurliacci* v. *Mayer*, 218 Conn. 531, 544–45, 590 A.2d 914 (1991) (declining to adopt "bizarre interpretation" of General Statutes § 7-465 that would require court to

conclude it lacked subject matter jurisdiction over case tried before it solely because plaintiff failed to establish essential element of her cause of action). As was the case in *McCutcheon & Burr, Inc.*, the court had jurisdiction to resolve the plaintiff's two causes of action, both of which are premised on the defendants' alleged breach of the listing agreement. See *Anderson* v. *Schieffer*, 35 Conn. App. 31, 37 n.8, 645 A.2d 549 (1994) ("an alleged failure to comply with § 20-325a (a), which . . . begins by providing that '[n]o person . . . shall commence or bring any action,' does not create a jurisdictional bar").

In fact, this conclusion is even clearer given the amendments to § 20-325a, made after our Supreme Court's decision in *McCutcheon & Burr, Inc.*, which permit recovery upon substantial compliance with the requirements of the statute. See footnote 9 of this opinion. Because of those amendments, a plaintiff cannot be denied recovery under § 20-325a solely because of its failure to comply strictly with the licensing requirements of the statute. See *Location Realty, Inc.* v. *General Financial Services, Inc.*, supra, 273 Conn. 781 ("[A] corporate broker licensee, whose president was not licensed as a broker, may not be denied its right to recover a commission otherwise earned solely because of that licensing failure. Its right to recover must be gauged, instead, under all of the facts and circumstances of the case and whether it would be inequitable, in light of those facts and circumstances, to deny it the right to recover."). To the contrary, a plaintiff that does not strictly comply with the licensing requirements of the statute has the opportunity to prove that it substantially complied with the statute and that denying it a commission would be inequitable. Id. The court clearly has subject matter jurisdiction to determine whether the plaintiff has proven these elements despite the plaintiff's failure to comply strictly with the licensing requirements. Thus, the defendants' claim that the court erred in concluding that the plaintiff had substantially complied with the licensing requirements of the statute does not implicate the court's subject matter jurisdiction. The court had jurisdiction to consider the plaintiff's breach of contract and CUTPA claims.

II

The defendants' second claim is that the trial court improperly concluded that the defendants had breached the listing agreement. Specifically, the defendants assert that the court erroneously found that Longo engaged in conduct that interfered with the plaintiff's efforts to complete the sale of the property and erroneously substituted its own theory of recovery in place of the plaintiff's theory of recovery. We agree with the defendants that the court made a clearly erroneous finding on which it based its conclusion that the defendants had breached the listing agreement.

Factual matters are determined by the finder of fact

and are not subject to reversal on appeal unless such findings are clearly erroneous. See *Groton* v. *Yankee Gas Services Co.*, 224 Conn. 675, 691, 620 A.2d 771 (1993); *Crowell* v. *Danforth*, 222 Conn. 150, 156, 609 A.2d 654 (1992). "A finding of fact is clearly erroneous when there is no evidence in the record to support it . . . or when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed. . . . Under the clearly erroneous standard of review, a finding of fact must stand if, on the basis of the evidence before the court and the reasonable inferences to be drawn from that evidence, a trier of fact reasonably could have found as it did." (Internal quotation marks omitted.) *CitiMortgage, Inc.* v. *Gaudiano*, 142 Conn. App. 440, 444–45, 68 A.3d 101, cert. denied, 310 Conn. 902, 75 A.3d 29 (2013); see also Practice Book § 60-5. "Where, however, some of the facts found are clearly erroneous and others are supported by the evidence, we must examine the clearly erroneous findings to see whether they were harmless, not only in isolation, but also taken as a whole." *DiNapoli* v. *Doudera*, 28 Conn. App. 108, 112, 609 A.2d 1061 (1992). When the judgment of the trial court is based entirely on a clearly erroneous finding, and without that finding judgment would have entered for the other party, it is appropriate to reverse the judgment and remand the case with direction to render judgment for that party. See *Bayer* v. *Showmotion, Inc.*, 292 Conn. 381, 415–16, 973 A.2d 1229 (2009) (reversing judgment and remanding case with direction to render judgment for defendant after concluding that trial court's factual findings were clearly erroneous and harmful in that they affected result).

The following facts are relevant to our analysis. In its April 17, 2019 memorandum of decision, the trial court examined the listing agreement and determined that it contained three provisions that would obligate the defendants to pay a commission to the plaintiff. The first provision applied if the plaintiff procured a ready, willing, and able buyer during the term of the listing agreement in accordance with the price, terms, and conditions of the listing, or in accordance with a price, terms, and conditions that were acceptable to the defendants. The second provision applied if, during the term of the listing agreement, the property was sold or became subject to an agreement to purchase or option, through the efforts of anyone, including the defendants, to anyone, including a co-owner of the property. The third provision applied if the property was sold, conveyed, or became subject to an agreement to purchase or option to purchase, within 180 days after the term of the listing agreement, to anyone who was introduced to the property by anyone, including the defendants, prior to the expiration of the term of the listing agreement. The court found that the only provi-

sions pleaded in the amended complaint were the first and second provisions. The court concluded that the plaintiff failed to prove that it was entitled to its commission under either provision.

Next, the court examined the plaintiff's claim that it was entitled to judgment on its breach of contract claim in accordance with this court's holding in *William Raveis Real Estate, Inc.* v. *Zajaczkowski*, 172 Conn. App. 405, 160 A.3d 363, cert. denied, 326 Conn. 906, 163 A.3d 1205 (2017). In *William Raveis Real Estate, Inc.*, the defendants were a couple who had sought to purchase a house. Id., 408. The defendants were referred to a licensed real estate agent affiliated with the plaintiff, a real estate brokerage firm that represented buyers and sellers. Id., 407–408. Prior to showing the defendants a particular house, the real estate agent presented the defendants with an agreement for a term of one year, which provided, in part, that the real estate agent would negotiate the terms and conditions of the purchase of any property that the defendants wished to buy and that the plaintiff would earn a commission if the defendants purchased a home during the term of the agreement. Id., 408–409. After the agreement was signed, the defendants submitted an offer to purchase a property in Trumbull that was shown to them by the real estate agent. Id., 409. The transaction to purchase the property was not consummated because a bank appraisal failed to support the purchase price and the defendants were unable to obtain a mortgage. Id. Several months later, still during the term of the agreement, the defendants entered into a fully executed purchase and sale contract for a different property in Trumbull that was shown to them by a real estate agent who was not affiliated with the plaintiff. Id., 411. The plaintiff then commenced litigation to obtain payment of the commission it alleged it was owed in connection with the defendants' purchase of the property. Id., 407.

The trial court in *William Raveis Real Estate, Inc.*, held that the defendants' actions constituted a breach of their agreement with the plaintiff. Id., 413. Specifically, it found that the defendants breached the agreement with the plaintiff by entering into an enforceable contract to purchase the property while the agreement with the plaintiff was still in effect. Id., 419. The court also found that the defendants breached the agreement by failing to inform the nonaffiliated real estate agent of the existence of their agreement with the plaintiff, failing to use the plaintiff as their exclusive real estate broker to represent and assist them in locating and purchasing the property, failing to work exclusively through the plaintiff to locate and purchase the property, and failing to refer information about the property to the plaintiff. Id. On the basis of these findings, the court rendered judgment for the plaintiff. See id., 419–20.

On appeal, the defendants claimed that the court erred in concluding that they breached their agreement with the plaintiff by entering into a fully executed contract to purchase the property during the term of the agreement when the contract to purchase the property was illusory, unenforceable, and not a contract as a matter of law. Id., 415. This court concluded that there were factual and legal bases on which the trial court properly had found that the defendants breached the agreement and, thus, did not decide whether the contract to purchase the property was illusory, unenforceable, and not a contract as a matter of law. Id., 419 n.7. This court concluded further that the defendants breached numerous express provisions of the agreement during its term, but emphasized that the defendants had breached two significant provisions when they (1) entered into an agreement with the nonaffiliated real estate agent and (2) executed a contract to purchase the property. Id., 419–20. Thus, this court concluded that the defendants caused the plaintiff to suffer damages in that their breach of the agreement led directly and proximately to the plaintiff's loss of a commission. Id.

In the present case, the trial court found that Longo, at the end of September, 2014, instructed Anthony Kolich, the purchaser's principal conducting negotiations on behalf of Empire, to cease communication with Porricelli and negotiate solely with Longo. The court found that Longo's act occurred while Porricelli was heavily involved in negotiations with Empire and, as a result, took the plaintiff out of negotiations during October, 2014, the final month of the listing agreement. The court concluded that "[t]he act of instructing [Empire] to cease all contact with [the plaintiff] and deal only with [Longo] while there was still a month remaining in the term of [the listing agreement] . . . was a breach of the [listing agreement] which gave [the plaintiff] the right, until October 31, 2014, to 'control the right to market the [p]roperty' and obligated the . . . defendants '[t]o refer all inquiries and offers for the purchase and/or rental of said [p]roperty to [the plaintiff]' and '[t]o cooperate with [the plaintiff] in every reasonable way' thereby causing [the plaintiff] . . . to lose any opportunity to participate in the effort to reach a settlement of the minor acreage dispute over the size of the property and to earn its commission. Under the rule of *William Raveis Real Estate, Inc.*, [the plaintiff] is awarded breach of contract damages in the full amount of the commission it would have earned if those negotiations had been successful during the remaining term of [the listing agreement] . . . ."

The defendants claim that the court's finding that Longo caused the plaintiff to lose the opportunity to negotiate with Empire during the final full month of the listing agreement was clearly erroneous. They argue

that the evidence shows that, contrary to the court's findings, Porricelli was an active participant in negotiations through the end of the term of the listing agreement. We agree.

The only evidence in the record that arguably supports the court's finding that Longo instructed Kolich not to deal with Porricelli was Kolich's response to two questions during his testimony at trial. First, Kolich was asked: "After the deal fell through, after more or less September of 2014, who reinstituted the purchase and sale negotiations?" Kolich answered: "I believe at that point, we were instructed not to speak to [Porricelli]. So I believe we reached out to [Longo]." Second, Kolich was asked: "Who instructed you not to deal with [Porricelli]?" His answer was: "[Longo]." Although this testimony, viewed in artificial isolation, appears to support the challenged finding, a review of the rest of the evidence presented at trial makes clear that the court's reliance on these two answers was misplaced and clearly erroneous.

First, Kolich's full testimony on this issue makes clear that he did not testify that Longo instructed him in September not to speak with Porricelli. The following colloquy between Kolich and the defendants' counsel is relevant:

"[The Defendants' Counsel]: After the deal fell through, after more or less September of 2014, who reinstituted the purchase and sale negotiations?

"[Kolich]: I believe at that point, we were instructed not to speak to [Porricelli]. So I believe we reached out directly to [Longo].

"[The Defendants' Counsel]: So you dealt directly with [Longo] after the initial contract was terminated?

"[Kolich]: Yes.

"[The Defendants' Counsel]: Who instructed you not to deal with [Porricelli]?

"[Kolich]: [Longo].

"[The Defendants' Counsel]: Do you remember when that was?

"[Kolich]: No. It was sometime after the first contract was—was null and void.

"[The Defendants' Counsel]: Was null and void?

"[Kolich]: Yeah. I mean it was—

"[The Defendants' Counsel]: Okay.

"[Kolich]:—one went away and then there was no deal. And then we called [Longo] and [Longo said] let's work this out. And we called [Porricelli] and [Porricelli] said I—[Longo] told me that you know, I can't talk to you guys anymore. And we started to deal with [Longo]."

Kolich's full testimony on this point undermines, in two significant ways, the court's factual finding that Longo instructed Kolich in September not to speak with Porricelli. First, Kolich testified that he did not remember when he was instructed not to speak with Porricelli. Kolich testified that he was instructed not to speak with Porricelli after the first contract between Empire and the defendants was "null and void." He never testified that the conversation took place in September. Second, he did not testify that the instruction not to speak to Porricelli came directly from Longo. Instead, Kolich testified that Porricelli told him that Longo had instructed Porricelli that he was not permitted to talk to Empire anymore. Consistent with this testimony, Kolich also testified that he reached out to Longo after being instructed not to speak with Porricelli. The only reasonable inference to draw from Kolich's testimony is that Kolich would not have needed to reach out to Longo if Longo was the one who told him not to speak with Porricelli.

In addition, Porricelli did not testify that the defendants prevented him from participating in negotiations before the end of the term of the listing agreement. In fact, when asked whether he was "able to get [Empire] and the [defendants] back to a meeting of the minds on or before October 31, 2014," he testified: "We got them back to the table twice. Once in September and once in October." Porricelli's uncontradicted testimony shows that the plaintiff was involved in negotiations with Empire after September.

Finally, the uncontradicted documentary evidence clearly shows that the plaintiff, in particular Porricelli, was active in negotiating with Empire through the end of October, 2014, and, in fact, took the lead in such negotiations. For example, on October 6, 2014, Longo e-mailed Porricelli all of his e-mail correspondence with the attorney representing the defendants in their negotiations with Empire. On October 22, 2014, Porricelli e-mailed Kolich a final proposal from the defendants in which he referred to the defendants as "my clients." Shortly thereafter, Kolich responded directly to Porricelli with a counteroffer. In response, Porricelli replied in an e-mail: "Anthony, after further thought and discussion, if you [cannot] sign a contract in 48 [hours] and close the deal in 60 days, we have nothing further to discuss. We are done negotiating this deal!

"On behalf of my clients and their attorneys, we wish not be contacted with any other negotiations/offers regarding [the property]." Porricelli then sent Kolich another e-mail in which he stated: "I gave you a layup with my final offer! . . . I will not have my clients [toe] the line and carry the cost of the property for 8 months while you get all your permits [etc.]. It doesn't work that way. I offered you March, now it is 60 days." The next day, October 23, 2014, Porricelli e-mailed

Longo lamenting that "we have all been through the ringer with Anthony Kolich" and proposing a new marketing strategy for the property. Despite his e-mail to Longo, later that same day, Porricelli e-mailed Kolich a new offer, which he asked Kolich to "sign off on" *before* Porricelli spoke to his "clients." Only after Kolich responded positively to Porricelli's offer did Porricelli e-mail the proposed deal to Longo and asked him to call him "ASAP." After Longo expressed his lack of faith in Empire's offer, Porricelli e-mailed Longo encouraging him to accept the offer. The two men then exchanged additional e-mails regarding the merits of Empire's offer. In the evening of October 23, 2014, Porricelli sent an e-mail to the defendants and their lawyers in which he stated: "After much time speaking with Kolich and further conversations with [Longo], *I have negotiated the new terms listed below*." (Emphasis added.) On October 24, 2014, Porricelli and Longo continued to exchange e-mails regarding the merits of the proposed deal. On October 27, 2014, Porricelli e-mailed the defendants and their attorneys: "Per [Longo's] last e-mail on [October 24], have we decided not to accept the offer or do we want to come up with a counter to try and get the deal done?"[10]

On the basis of our review of the full evidentiary record, we are left with the definite and firm conviction that the court's finding that the plaintiff was taken out of the negotiations during the last month of the listing agreement was a mistake. The plaintiff, principally through the efforts of Porricelli, was heavily involved in negotiations between the defendants and Empire through the end of October, 2014, when the listing agreement ended. Porricelli testified that he got the parties back to the bargaining table in October and the undisputed documentary evidence shows that he was the lead negotiator for the defendants until at least October 24, 2014.

The court's memorandum of decision makes clear that the court's clearly erroneous factual finding was the basis for its conclusion that the defendants breached the listing agreement and caused the plaintiff to suffer damages. The court held that Longo's "act of instructing [Empire] to cease all contact with [the plaintiff] and deal only with [Longo] *while there was still a month remaining in the term of the* [*listing agreement*]" constituted a breach of several provisions of the listing agreement and "thereby" caused the plaintiff to lose the opportunity to earn its commission. (Emphasis added.) The court did not find any other breaches of the listing agreement by the defendants.[11]

Thus, we conclude that the court's clearly erroneous finding was not harmless. Because the court's conclusion that the defendants breached the listing agreement is based solely on a clearly erroneous factual finding, the court's judgment as to that count must be reversed

and judgment rendered for the defendants. See *Bayer* v. *Showmotion, Inc.*, supra, 292 Conn. 415–16.

## III

Next, the defendants claim that the trial court improperly concluded that they had violated CUTPA. In particular, the defendants argue that the court improperly concluded that they, through Longo, were engaged in the trade or commerce of real estate acquisition, thereby, satisfying the statutory requirement under CUTPA[12] that the unfair acts must have occurred in the conduct of any trade or commerce. The defendants argue that they were not engaged in the trade or commerce of real estate acquisition at the time of the occurrence of the purported CUTPA violations. In response, the plaintiff contends that the defendants were engaged in a "competing trade or commerce because they were trying to sell the property themselves while under the obligation to deal exclusively with [the plaintiff]." We agree with the defendants.

"To state a claim under CUTPA, the plaintiff must allege that the actions of the [defendants] were performed in the conduct of trade or commerce. . . . Moreover, a CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce." (Citations omitted; internal quotation marks omitted.) *Sovereign Bank* v. *Licata*, 116 Conn. App. 483, 493–94, 977 A.2d 228 (2009), appeal dismissed, 303 Conn. 721, 36 A.3d 662 (2012).[13] Whether a defendant is subject to CUTPA is a question of law that is subject to plenary review. See *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 125 Conn. App. 678, 700, 10 A.3d 61 (2010), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011).

In its April 17, 2019 memorandum of decision, the court only briefly addressed the trade or commerce requirement, stating: "Neither party has raised any issue as to whether or not this single sale of a family owned parcel of land was a transaction 'in the conduct of any trade or business.' Since [Longo] held a real estate broker's license and inserted himself as of November 1, 2014, as the broker of record for the sellers, the court will treat this as a 'trade or business' dispute at least as to him." The court then went on to discuss whether the unfair acts alleged in the operative amended complaint constituted CUTPA violations.

The defendants argue that the court was correct in concluding that a single sale of a family owned parcel of land is not sufficient to meet the trade or commerce requirement of CUTPA. They then argue that the court's reliance on the fact that Longo was a licensed real estate broker and inserted himself into the transaction was in error for several reasons. First, they argue that the plaintiff made no such claim in its complaint. Second, they argue that the alleged CUTPA violations in

the complaint and found by the court all occurred prior to November 1, 2014, before the defendants entered into a listing agreement with Longo and after their listing agreement with the plaintiff had expired. Therefore, according to the defendants, Longo was in the same position as the other defendants at the time of the alleged CUTPA violations; he was one member of the family involved in a single sale of the parcel that the defendants jointly owned.

In response, the plaintiff argues that the court properly held that the defendants were involved in trade or commerce because they were, as a group, competing with the plaintiff to sell the property during the term of the listing agreement. In support of this argument, the plaintiff points to evidence that the defendants failed to disclose inquiries from potential buyers to the plaintiff and agreed that they would share any commission to which Longo became entitled pursuant to the November 1, 2014 listing agreement. Relying on our Supreme Court's opinion in *Larsen Chelsey Realty Co.* v. *Larsen*, 232 Conn. 480, 656 A.2d 1009 (1995), the plaintiff argues that the defendants were engaged in trade or commerce for purposes of CUTPA because Longo was marketing the property on behalf of the defendants during the term of the listing agreement in direct competition with the plaintiff. We agree with the defendants that the court's finding that the defendants were engaged in trade or commerce at the time of the CUTPA violations was legally incorrect.

Initially, we agree with the trial court that the defendants' sale of a single family owned parcel does not constitute trade or commerce for the purposes of CUTPA. This court has previously held that where the sellers of commercial property are not in the business of selling real property, "CUTPA is inapplicable to the transaction" at issue. *Biro* v. *Matz*, 132 Conn. App. 272, 290, 33 A.3d 742 (2011). There is no evidence in this case that the defendants were in the business of selling real estate, other than the evidence that Longo was a licensed real estate broker. Thus, we agree with the trial court that any alleged CUTPA violations must be connected to Longo's activities as a real estate broker.

The trial court found that Longo "inserted himself as of November 1, 2014," using his real estate broker's license and, thus, engaged in trade or commerce.[14] The problem with the court's analysis is that all of the acts it determined to be CUTPA violations occurred before November 1, 2014. The court found that Longo's breach of the listing agreement by directing Empire to cease all communications with the plaintiff during the term of the listing agreement and "misrepresentations [or] nonrepresentations as to the true ownership status of the property, the interfamily litigation background, and the [mortgage] on the property" *that preceded that breach* constituted the CUTPA violations. As noted pre-

viously in this opinion, the court found that the directive that Empire cease communications with the plaintiff occurred sometime in September, 2014. Although we have concluded that this finding was clearly erroneous, any such instruction could only constitute a breach of the listing agreement if it occurred during the term of the listing agreement, which expired on October 31, 2014, the day before the court concluded that Longo "inserted himself" using his broker's license. Furthermore, because the court found that the other CUTPA violations were misrepresentations and nonrepresentations that preceded the breach, they necessarily also occurred before November 1, 2014. Consequently, at the time that Longo and the other defendants engaged in conduct that the court described as unscrupulous, immoral, unfair and deceptive, none of them did so while engaged in trade or commerce for purposes of CUTPA.[15]

We also conclude that the plaintiff's reliance on *Larsen Chelsey Realty Co.* is misplaced. That case involved an action between a real estate company that sought damages against its former president and a competing real estate company, wherein several claims were alleged, including violations of CUTPA. See id., 483. At trial, the court set aside the jury verdict for the plaintiff on its CUTPA count, holding that (1) the pleadings and evidence repeatedly described an employer-employee relationship between the plaintiff and its former president that could not be the basis for a CUTPA claim, and (2) the plaintiff could not prevail on its CUTPA count because the plaintiff had an employer-employee relationship with its former president as opposed to a consumer relationship. Id., 490–91.

On appeal, our Supreme Court reversed the judgment of the trial court, holding, inter alia, that (1) the alleged acts involved conduct that occurred outside the confines of an employer-employee relationship and (2) CUTPA does not impose a requirement of a consumer relationship. Id., 494–95. The court held that the jury reasonably could have found that the defendant was engaged in trade or commerce because the defendant's activities "implicated the services of both [the defendant] and the plaintiff as real estate brokers in the New Haven area and thus implicated trade or commerce under CUTPA." Id., 494.

In its appellate brief, the plaintiff argues: "Applying the *Larsen Chelsey Realty Co.* analysis to the facts found by [the] trial court, [Longo] may have been the only licensed broker among the defendant owners, but he was engaged in marketing the property on behalf of his cousins while all of the defendants were bound by the listing agreement with [the plaintiff]. This conduct, together with the defendants' disclosures and nondisclosures, resulted in the defendants waiting out until [the plaintiff's] listing agreement expired so the defen-

dants could receive the commission for themselves. Once [the plaintiff's] listing [agreement] expired, Longo made a very similar deal directly with [Empire] and cut [the plaintiff] out of its commission."

There are several problems with the plaintiff's analysis. First, other than the court's clearly erroneous finding that the defendants in September, 2014, instructed Empire to cease communications with the plaintiff and thereby prevented the plaintiff from participating in negotiations during the last month of the listing agreement, the court made no finding that the defendants breached the listing agreement or committed any CUTPA violation by marketing the property to prospective buyers. In fact, the court did not mention a single prospective buyer other than Empire and made no finding that the defendants were unfairly competing with the plaintiff for such prospective buyers. Second, unlike in *Larsen Chelsey Realty Co.*, in which both the defendant and the plaintiff were acting as real estate brokers, in this case, at least during the term of the listing agreement, the defendants were acting as owners of the property. They did not need a broker's license to discuss the sale of their property with any prospective buyers. Although the terms of the listing agreement may have obligated them to refer any such inquiries to the plaintiff, their failure to do so would not constitute their participation in trade or commerce for the purposes of CUTPA. Third, contrary to the plaintiff's suggestion, the court made no finding that the defendants were engaged in conduct to "wait out" the expiration of the listing agreement so that they could receive the commission themselves. Thus, *Larsen Chelsey Realty Co.* is inapposite.

In sum, we conclude that the court erred in concluding that the actions of the defendants were performed in the conduct of trade or commerce for purposes of CUTPA. Accordingly, the trial court improperly rendered judgment for the plaintiff on its CUTPA claim.

The judgment is reversed and the case is remanded with direction to render judgment for the defendants on both the breach of contract and CUTPA claims.

In this opinion the other judges concurred.

[1] Salvatore R. Longo, Anthony Longo, the estate of Salvatore Longo, Jr., Salvatore Longo & Sons, LLC, The Higgins Group, Inc., doing business as Higgins Group Real Estate (The Higgins Group), and Mark F. Katz were named as defendants in the complaint. Anthony Longo and The Higgins Group were nonappearing defendants before the trial court. At oral argument before this court, the appellants' counsel stated that he is representing all of the defendants except The Higgins Group. In their principal brief, however, the appellants' counsel stated that The Higgins Group and Mark F. Katz are not involved in this appeal. For clarity, we refer to Salvatore R. Longo, Anthony Longo, the estate of Salvatore Longo, Jr., and Salvatore Longo & Sons, LLC, collectively, as the defendants.

Additionally, we note that the trial case caption appears to contain a scrivener's error as Salvatore R. Longo is identified as "Salvatore B. Longo."

[2] On the same day, the defendants listed, separately, 143 Leon Place in Stamford for sale with the plaintiff for $949,000; the defendants executed a second listing agreement with the plaintiff for 143 Leon Place. The plaintiff's

amended complaint makes neither a claim of a separate sale for 143 Leon Place nor a claim of any commission related solely to 143 Leon Place.

[3] The court concluded that the defendants failed to prove their special defenses and rendered judgment for the plaintiff on the defendants' counterclaim, noting that the defendants expressly abandoned in their posttrial brief all counts of their counterclaim. The court's disposition of the special defenses and counterclaim are not at issue in this appeal.

[4] General Statutes § 20-312 provides in relevant part: "(a) No person shall act as a real estate broker or real estate salesperson without a license issued by the commission or the Commissioner of Consumer Protection, unless exempt under this chapter. . . ."

[5] The court found that no claim was made for any commission related solely to 143 Leon Place, and, therefore, it held that the second listing agreement was not at issue in the case.

[6] General Statutes § 20-325a (d) provides: "Nothing in subsection (a) of this section, subdivisions (2) to (7), inclusive, of subsection (b) of this section or subsection (c) of this section shall prevent any licensee from recovering any commission, compensation or other payment with respect to any acts done or services rendered, if it would be inequitable to deny such recovery and the licensee (1) has substantially complied with subdivisions (2) to (7), inclusive, of subsection (b) of this section or (2) with respect to a commercial real estate transaction, has substantially complied with subdivisions (2) to (6), inclusive, of subsection (b) of this section or subdivision (2) of subsection (c) of this section."

[7] In light of our resolution of the defendants' second and third claims, we need not address the defendants' argument that the court improperly concluded that the plaintiff had substantially complied with the statute and that it would be inequitable to deny it a commission given the facts of this case.

[8] "In asserting that a failure to comply with . . . § 20-325a (b) creates a jurisdictional problem, the defendants rely primarily on the portion of the statute that provides: 'No person . . . shall commence or bring any action . . . .' We note that similar language is found in the statute of frauds; General Statutes § 52-550; and in the statute of limitations for tort actions set forth in General Statutes § 52-577. Neither of those statutes creates a jurisdictional bar. See *Seipold* v. *Gibbud*, 110 Conn. 392, 395, 148 A. 328 (1930) (statute of frauds); *Orticelli* v. *Powers*, 197 Conn. 9, 15–16, 495 A.2d 1023 (1985) (§ 52-577)." *McCutcheon & Burr, Inc.* v. *Berman*, supra, 218 Conn. 527 n.16.

[9] Subsection (d) of § 20-325a, which permits recovery of a commission upon substantial compliance with subsections (b) and (c), was not added to the statute until 1994, after the Supreme Court issued its decision in *McCutcheon & Burr, Inc.*

[10] On October 28, 2014, Porricelli sent an e-mail to Attorney James Rubino asking about a meeting between Empire and the defendants the previous day at which a deal may have been reached. Rubino responded that he was not at the meeting and Porricelli asked him to keep him posted because he was unable to contact Longo. There was no evidence that an agreement was reached between Empire and the defendants at that meeting. Finally, on October 30, 2014, Porricelli sent a proposed extension of the listing agreement to the defendants for signature. The extension was never signed.

[11] The plaintiff argues that the defendants breached the listing agreement in several other ways. It argues that the evidence showed that Longo was speaking to prospective buyers of the property without informing Porricelli and Feda and failed to turn over offer letters from prospective buyers to the plaintiff. The plaintiff also argues that the court found that the defendants misrepresented to the plaintiff who actually owned the property. The problem with the plaintiff's arguments is that the court never found that the defendants breached the listing agreement through their contacts with prospective buyers or that their misrepresentations constituted breaches of the agreement. Furthermore, the court did not find that such conduct caused the plaintiff any damages. We therefore decline to address these issues because they are irrelevant to the grounds on which the court expressly relied in rendering its judgment.

[12] General Statutes § 42-110b (a) provides: "No person shall engage in unfair methods of competition and unfair or deceptive acts or practices in the conduct of any trade or commerce."

[13] " 'Trade' and 'commerce' means the advertising, the sale or rent or lease, the offering for sale or rent or lease, or the distribution of any services and any property, tangible or intangible, real, personal or mixed, and any other article, commodity, or thing of value in this state." General Statutes § 42-

110a (4). Furthermore, such activities constitute trade or commerce only if the party is engaged in the business of conducting such activities. See, e.g., *Landmark Investment Group, LLC* v. *Chung Family Realty Partnership, LLC*, 125 Conn. App. 678, 700, 10 A.3d 61 (2010) ("CUTPA violation may not be alleged for activities that are incidental to an entity's primary trade or commerce" (internal quotation marks omitted)), cert. denied, 300 Conn. 914, 13 A.3d 1100 (2011).

[14] The court made this finding "at least as to [Longo]." The court made no finding that any of the other defendants engaged in any trade or commerce for purposes of CUTPA. Despite making no such finding, the court found for the plaintiff and against all of the defendants on the plaintiff's CUTPA claim. Because we are reversing the court's decision for other reasons, we need not consider whether there was a basis to conclude that the defendants other than Longo were engaged in trade or commerce for purposes of CUTPA.

[15] We assume, arguendo, that Longo's primary trade or commerce as of November 1, 2014, was the marketing and brokering of real estate. Nonetheless, we note that the trial court, in its memorandum of decision, stated that Longo "was and is a licensed real estate broker, but has never worked as such as his primary occupation . . . ." During trial, Longo testified that his principal employment from 1972 to 2008, was operating an asphalt paving and excavating business. Longo further testified that he created a limited liability company (company) in 2007, due to the growth of the business and the liability of the business' real estate assets. Longo testified that the company stopped operating after 2007, and that, afterward, he made a business decision to sell the company's assets. He also testified that a court proceeding required him to sell one of his real estate assets.

Longo, however, did testify that he engaged in the business of real estate transactions during 2013, in which he conducted eight to nine real estate deals using his broker's license. Nonetheless, the record does not contain ample evidence from which the trial court reasonably could have concluded that the defendants' primary trade or business was the sale and development of real estate. Longo testified that the sale of the property arose from a business decision and a court order. Furthermore, Longo testified that he never utilized his license as a broker as his primary employment. Also, the record does not establish an agency relationship between Longo and the other defendants, in a capacity in which he was engaging in real estate transactions on their behalf.

———————————————